The UNITED STATES of America, Plaintiff-Appellee,

v.

Ralph T. HICKEY, Frank J. Graves, Raymond J. Heiderscheidt, Joseph M. Kearns and James Graves, Defendants-Appellants.

Nos. 15015–15018.

United States Court of Appeals Seventh Circuit.

April 4, 1966.

Robert J. Leali, Woodstock, Ill., for defendant-appellant Ralph T. Hickey; Carroll, Leali & Gitlin, Woodstock, Ill., of counsel.

Thomas P. Sullivan, Hugh M. King, Chicago, Ill., for defendants-appellants Frank J. Graves, Raymond J. Heiderscheidt, Joseph M. Kearns and James

Graves; Raymond, Mayer, Jenner & Block, Chicago, Ill., of counsel.

Edward V. Hanrahan, U. S. Atty., John Peter Lulinski, John Powers Crowley, Barry J. Freeman, Asst. U. S. Attys., Chicago, Ill., for appellee, Lawrence Jay Weiner, Asst. U. S. Attys., of counsel.

Before SCHNACKENBERG, KNOCH, and SWYGERT, Circuit Judges.

SWYGERT, Circuit Judge.

The defendants appeal from jury verdicts of guilty on one or more counts of a three-count indictment charging them with conspiracy to defraud a federally insured savings and loan association through fraudulent misapplication of its funds, 18 U.S.C. § 657,[1] and fraudulent participation in loans issued by it, 18 U.S.C. § 1006.[2] All five defendants, Ralph T. Hickey, Frank J. Graves, James Graves, Raymond J. Heiderscheidt, and Joseph M. Kearns, were found guilty of conspiracy. With two exceptions, guilty verdicts were also returned as to all defendants on the substantive counts in which Hickey was charged as a principal and the other defendants as aiders and abettors. Heiderscheidt and Kearns were found not guilty on the count charging fraudulent misapplication of funds and Kearns was acquitted on the count charging fraudulent participation in the proceeds of an association loan.

The facts are complicated. A capsule summary of the transactions which gave rise to the criminal prosecutions will be given before proceeding to a more complete recitation of the relevant evidence.

[1]. 18 U.S.C. § 657 reads in pertinent part: Whoever, being an officer, agent or employee of * * * any institution the accounts of which are insured by the Federal Savings and Loan Insurance Corporation * * * willfully misapplies, any moneys, funds, credits, securities or other things of value belonging to such institution, or pledged or otherwise intrusted to its care, shall be fined not more than $5,-000 or imprisoned not more than five years, or both * * *.

[2]. 18 U.S.C. § 1006 reads in pertinent part: Whoever, being an officer, agent or employee of * * * any institution the accounts of which are insured by the Federal Savings and Loan Insurance Corporation, * * * with intent to defraud the * * * institution * * * participates or shares in or receives directly or indirectly any money, profit, property, or benefits through any transaction, loan, commission, contract, or any other act of any such corporation, institution, or association, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

Ralph Hickey controlled and was the managing officer of Concord Savings and Loan Association, Chicago, Illinois. He caused Concord to issue two mortgage loans totalling $350,000. The proceeds of these loans were used by Frank and James Graves to acquire title to certain parcels of real estate which nominally secured the loans themselves and to purchase control of Concord from Hickey for $250,000. The transfer of control of Concord was made pursuant to a formal agreement between Hickey and Frank Graves secured by a stock escrow for which Joseph Kearns provided the stock. Frank Graves, Kearns, and Raymond Heiderscheidt became directors of Concord immediately following the transfer of control.

The detailed facts surrounding and material to those just recited began early in 1960. They will be traced chronologically for the most part, although the pattern will at times be broken for purposes of explanation.

On January 20, 1960, Ralph Hickey acquired control of Concord Savings and Loan Association through the purchase of a related insurance agency for $126,-000. Before many months had passed, he began looking around for someone to buy Concord. In the late spring of 1960 Hickey quoted an asking price of $250,-000 to a mortgage broker and realtor named Milton Price. Hickey told Price that if a buyer could be found he would be willing to help generate cash for the purchase by causing Concord to make mortgage loans to the prospective buyer in an amount sufficient to cover the cost of acquiring control of Concord.

At that time Price was sharing office space in the Chicago loop with Frank Graves, Graves' son James, and Graves' son-in-law Raymond Heiderscheidt.[3] Price related Hickey's proposal to James Graves and the latter relayed the information to his business associates. Interest in Hickey's offer was expressed, and

sometime in July 1960 Price arranged a meeting at the Concord offices attended by all the defendants except Kearns. Precisely what agreements were reached at that meeting will perhaps never be known, but essentially the Graveses and Heiderscheidt agreed to line up property which would support an appraisal sufficient to justify a return agreement by Hickey to cause Concord to loan enough money to purchase the property arranged for and leave $250,000 for the purchase by Frank Graves of the lending institution. Further, as shown by subsequent events, it was agreed that the true identity of the borrowers and the disposition and repayment of the loans would have to be camouflaged to avoid suspicion.

The real estate selected by the prospective purchaser of the stock control in Concord as capable of supporting the necessary loan was variously known as the Hartman farm and Hartman Estates. The Graveses considered this property to be at their disposal for reasons which provide the first digression from chronological sequence.

Hartman Estates was a 142-acre farm located just west of McHenry, Illinois. In December 1959, Frank Coquillard and George Hartman, Jr. each had a fifty per cent interest in the property.[4] (The farm was subject to a mortgage of about $35,000.) Concluding that this tract possessed subdivision-development possibilities, Coquillard approached James Graves and offered to dispose of his interest. Graves agreed to purchase Coquillard's half interest for $10,000 and a contract to this effect was signed. A few weeks later, Graves persuaded Coquillard and Hartman to place the farm in a trust at the La Salle National Bank, naming Coquillard and Hartman as equal beneficiaries with an equal power of direction. Thereafter, Graves induced Hartman to sign a similar trust agreement naming Frank Graves and Hartman as equal beneficiaries, but with the sole

3. The Graveses were engaged in the real estate development business under the name Real Estate Consultants, Inc.

4. Coquillard and Hartman each held 50% of the stock of Hartman Builders, Inc., which claimed the farm as its principal asset.

power of direction in Frank Graves. On February 4, 1960, Hartman signed various additional documents at James Graves' request. These documents included an assignment and an agreement by Hartman to sell six per cent of his beneficial interest in the Coquillard-Hartman trust to Frank Graves [5] and a contract wherein Hartman and Frank Graves gave each other the right of first refusal on their respective interests in the Hartman trust, based upon a September 1959 appraisal which valued the Hartman farm at $85,200.[6] Thus, in this context, the Graveses could deal with Hickey with some assurance that title to the Hartman farm could be obtained.[7]

Shortly after the Hickey-Graves-Heiderscheidt meeting in July 1960, the parties decided to view the Hartman farm. An inspection was made, but Hickey was not satisfied that the acreage would support an appraisal of the necessary magnitude. A parcel of about ten acres of vacant, unimproved land in Kane County, Illinois, known as the Schoolside subdivision, was then added as available for purposes of the loan, and Hickey was satisfied.[8] The amount of the loan required to accomplish the objectives already set forth was eventually settled at $350,000. This figure adequately assured the payment of costs, the purchase of Schoolside and the Hartman farm, and the transfer of Hickey's control of Concord.

The next step was the presentation of the proposed loans to Concord's board of directors. The presentation did not draw attention either to the true nature of the loans themselves or to the identity of the borrowers. On August 8, 1960, upon an application presented by Hickey, the Concord board of directors, unanimously and without reservation,[9] approved loans totalling $350,000 on the Hartman and Schoolside properties to the Wood-Stream Construction Company.[10] Wood-Stream was a building development firm. It had been contacted with reference to the development of the Hartman farm and Schoolside subdivision, but it had never made application for mortgage or construction loans in connection with these properties. Thus, as of August 8, 1960, Concord had, upon Hickey's representations, authorized a loan of $350,000 to a firm which neither applied for any such loan nor had any interest in the property securing it.

Shortly after the approval of the loan, efforts to secure favorable appraisals and to make legal arrangements for the disbursement of the loan funds and transfer of control in Concord commenced. Frank and James Graves and Heiderscheidt engaged several appraisers with little success. On August 26, 1960, John Enright submitted a preliminary valuation of $70,000 on the Hartman farm and $24,000 on Schoolside. Frank Graves told him not to bother reducing this appraisal to writing. On August 29, 1960, George Duffy submitted a preliminary appraisal setting the value of the Hartman farm at between $155,000 and $185,000. James Graves and Heiderscheidt asked him to

---

5. Hartman received $1500 for his signature on the agreement to sell.

6. This appraisal was performed by A. O. J. Baumann, Cary, Illinois.

7. When Coquillard became aware of the machinations jeopardizing his interest in the Hartman trust, he collaborated with Hartman in a letter of protest, dated February 15, 1960, to the La Salle National Bank, as trustee, instructing it not to deal with the trust property.

8. Schoolside was held in trust at the American National Bank.

9. The board of directors of Concord did Hickey's bidding. All loans were submitted by Hickey with an explanation of their character for the approval which inevitably followed.

10. The approval appears in the minutes of the directors' meeting as follows:
Upon a motion of D. Rappaport seconded by Fred Knez and unanimously carried that a mortgage be granted to Wood-Stream Construction Company in an amount not to exceed $350,000.00 for 18 months at 6½% interest and 4 points on property to be improved located in Schoolside Subdivision (33 lots) St. Charles, Illinois, and 188 lots and 1250 feet of commercial land located in Hartman Subdivision, McHenry, Illinois.

inflate this figure to $400,000, but Duffy refused the request as "misleading" and "unethical." Faced with such a lack of cooperation, James Graves pressed another appraiser into service. He prevailed upon M. A. Brown to appraise the Hartman farm and Schoolside as *improved* property. Brown quickly produced an appraisal of $406,500 on the Hartman farm "as developed with streets, sewer and all utilities" and an appraisal of $70,500 on Schoolside "as improved lots," listing the cost of improvements at $50,000. The Brown appraisals were given to Hickey at Concord on about September 1, 1960. Hickey, of course, knew that both the Hartman farm and Schoolside were unimproved.

Meanwhile, on August 23, 1960, all the defendants except Kearns met with Sherwin Willens, an attorney retained by Hickey, to work out legal details relating to the sale of Concord. Willens was informed that Concord proposed to loan money to the Graveses based upon the security of two parcels owned by them which had been appraised by Duffy at $600,000. Willens was also informed that $250,000 of the loan proceeds was earmarked for the purchase of Concord. Finally, Willens was told that attorney Harold Woodward [11] had been chosen to represent Frank and James Graves in the transfer of Concord. Aside from the obvious misrepresentation relating to the appraised value of the Hartman farm and Schoolside, it should be noted that Willens was not told that Concord had already approved a $350,000 loan on these properties to Wood-Stream Construction Company at Hickey's behest.

The vehicle selected by the parties to accomplish the staggered, inconspicuous loan disbursement and transfer of Concord was a series of escrow agreements prepared by the parties' attorneys. The first escrow was set up to receive the proceeds of the loans from Concord.[12] From this escrow, the money necessary to acquire a clear title to the Hartman farm and Schoolside was to be paid. The remaining $250,000 was to be paid into a second escrow,[13] to be disbursed at the direction of attorneys Willens and Woodward to coincide with the transfer of control in Concord. The transfer of Concord, in turn, was to be effected pursuant to contracts signed by Hickey and Frank Graves on September 8, 1960. A third escrow [14] was set up as an earnest money escrow to secure the successful completion of the Hickey-Graves contracts. This last escrow provides the occasion for Kearns' entry upon the scene. Kearns deposited his stock in it as the earnest money at the request of James Graves and Heiderscheidt.[15]

One other series of transactions must be mentioned to complete a review of the facts preceding the actual disbursement of the loans from Concord. On September 1, 1960, pursuant to Frank Graves' exercise of his powers of direction, the La Salle National Bank, as trustee, executed a $295,000 note and mortgage to Concord on the Hartman farm,[16] and the American National Bank, as trustee, executed a $55,000 note and mortgage to Concord on Schoolside.

The net proceeds from the loans [17] were paid into the first escrow on September 29, 1960. Payments from this escrow

---

11. Woodward was deceased at the time of the trial.

12. This escrow, No. 255516, was established at the Chicago Title and Trust Company on September 8, 1960, and was directed by attorneys Willens and Vincent Flood. Flood had been retained by the Graveses to clear title to the Hartman farm.

13. *American National Bank and Trust Company of Chicago*, Escrow No. 15817, dated September 8, 1960.

14. American National Bank and Trust Company of Chicago, Escrow No. 15816, dated September 7, 1960.

15. The stock was to be returned when $250,000 was paid into the Hickey-Graves escrow from the escrow set up to receive the loan proceeds. The return of the stock was "guaranteed" by an assignment of the Schoolside trust (see fn. 8).

16. The bank executed the mortgage despite the letter of protest it had received from Hartman and Coquillard (see fn. 7).

17. Two separate loans were actually involved, No. 4276 ($295,000) and No. 4275 ($55,000).

were directed on October 6 and 7, 1960. Hartman and Coquillard were separated from their remaining interests in the Hartman farm by receipt of checks from the escrow fund for $20,586.64 and $8,800 respectively.[18] The second escrow was enriched by $250,000 in the same manner. The final step, the payment to Hickey from the second escrow, did not occur until November 2, 1960. On that date, control of Concord shifted from Hickey to Frank Graves. Frank Graves was installed as managing officer and a director, Heiderscheidt became an officer and director, and Kearns was made a director.

While this legal machinery was toying with Concord's funds, an unexpected circumstance arose. During the first few days of October 1960, independent auditors arrived at Concord for their annual inspection. In the course of this audit, a random loan-verification letter was sent to Wood-Stream Construction Company requesting confirmation of a $350,000 loan. On October 6, 1960, Wood-Stream replied that it had not applied for a loan. This response caused the auditors some consternation, and they sought further explanation from Concord. The explanation was forthcoming within a few days. It was provided by a letter from attorney Woodward, dated October 11, 1960, which found its way into the Concord files. The letter stated that the writer's unnamed clients (the Graves group) had decided to substitute Homer C. Fitzgerald and Shur Construction Company for Wood-Stream as the developers of the Hartman farm and Schoolside.[19] It noted that this decision had been reached during the week of September 26, 1960, and apologized for the delay in relaying the information. Attached to the letter was an application for a construction loan on the Hartman farm signed by Fitzgerald on behalf of Shur. This development prompted the auditors to send a second loan-verification letter to Shur Construction Company, which was returned bearing the signature of Fitzgerald. Fitzgerald's confirmation, together with the letter of substitution and the M. A. Brown appraisals, satisfied the auditors. By about October 12, 1960, they were able to conclude that Concord's files reflected a construction loan to a builder for the purpose of making the improvements called for in the accompanying appraisals.

At this point, Fitzgerald's position requires a brief clarification. Fitzgerald was an experienced real estate man and home-builder in McHenry, Illinois. He was the sole owner of Shur Construction Company, an enterprise which was experiencing some financial difficulties. In July or August 1960, Fitzgerald was contacted by Frank and James Graves and Heiderscheidt with a view toward building on the Hartman farm. Several meetings with these persons ensued, including one at which Fitzgerald met Hickey. These discussions resulted in Fitzgerald's signing a number of documents put before him, some of them in blank and many of which he did not fully understand. These documents included contracts to purchase the Hartman farm and Schoolside from their respective trusts for a combined $405,000 (dated September 9, 1960), loan applications on these properties totalling $350,000 (dated September 13, 1960), loan closing statements (dated September 29, 1960), and the auditors' loan-verification letter. In spite of this legal documentation, however, Fitzgerald did not participate in the proceeds of the $350,000 Concord loan.

Following the audit of October 1960, Concord's Hartman-Schoolside loan files underwent a number of changes. For one thing, attorney Woodward's letter of October 11, 1960 proposing the substitu-

---

18. As part of the consideration for these checks, Hartman and Coquillard withdrew their letter of protest by a letter which was dated August 25, 1960, conveniently prior to the mortgage executed on September 1, 1960. Hartman also completed an assignment of his interest in the trust to Frank Graves which was dated May 3, 1960.

19. The substitution of Shur Construction Company for Wood-Stream as the borrower is reflected in the minutes of the October 10, 1960 meeting of Concord's board of directors.

tion of Shur for Wood-Stream was withdrawn. A somewhat similar letter, dated September 15, 1960, replaced it. This letter set the date of substitution as prior to the disbursement of the loan proceeds on September 29, 1960. It contained the added suggestion that Shur was not only negotiating for the development of the Hartman and Schoolside properties but was also considering their outright purchase from Woodward's clients, who were not identified in the letter. Secondly, the files were augmented by the appraisals of William Brinkman. Brinkman valued the Hartman farm at $399,000 and Schoolside at $72,500. Both properties were valued as unimproved, but on an individual-lot basis.[20]

The development of Hartman Estates never got off the ground after the transfer of control of Concord on November 2, 1960. Efforts to build on the property were beset with early and continuing difficulties. McHenry County was reluctant to give Fitzgerald the necessary building permits because the water table was too high. The pendency of lawsuits filed by Hartman and Coquillard claiming fraud in the sale of their interests in the farm further complicated matters.

In February and March 1961, an organization known as Rayka Corporation undertook the development of the Hartman farm and Schoolside and the payment of the loans. Rayka had been organized in December 1960 by nominees of the Graveses, presumably to build on the land controlled by them through construction loans from Concord. Kearns became its president in June 1961. Rayka paid the interest on the Hartman and Schoolside loans and repaid the principal on the Schoolside loan during 1961. At approximately the same time as these interest payments were being made, Rayka was receiving construction loans from Concord.[21]

Rayka continued to make semiannual interest payments on the Hartman loan during 1962. The principal became due in March 1963, but was not paid. On July 17, 1963, however, an agreement to extend the loan until March 1965 was entered between Concord and Rayka.[22] The September 1963 interest payment was the last of these payments made. A balance of $302,596.99 remained on the books of Concord on September 12, 1964. The loan was taken off the books when Frank Graves sold Concord to Telegraph Savings and Loan Association on the eve of trial.

Meanwhile, the Federal Bureau of Investigation commenced an investigation of Concord. A FBI agent contacted Frank Graves on February 2, 1961. A few days later, Frank and James Graves and Heiderscheidt attempted to induce a trust officer at the American National Bank to remove portions of the Schoolside file. When this effort failed, they took less drastic measures. Assignments of beneficial interests in the Schoolside trust were inserted into the file purporting to show that Shur Construction Company became the beneficial owner of the trust on September 23, 1960, prior to the Concord loan disbursement.

Roughly one year later, in February 1962, Fitzgerald had occasion to tell Hickey that a FBI agent was trying to contact him. Hickey arranged a meeting in his home on the same evening, which meeting was attended by Fitzgerald, James Graves, Kearns, and Hickey. During this conference, Graves offered Fitzgerald "all the mortgages" he wanted if he would "take" the fifth amendment.

## I.

The defendants in this appeal have advanced a great variety of trial errors, both substantive and procedural. With deference to the danger of oversimplifi-

20. For example, the appraisal of the farm was based upon its division into 188 lots and 1250 feet of business frontage. The business frontage was valued at $65 per foot. 132 lots were valued at $1600, 36 were valued at $1850, and 20 "lake frontage" lots were valued at $2000 each. There was no lake on the Hartman farm.

21. Residential development of the Schoolside property was successfully completed by Rayka through such loans.

22. Heiderscheidt represented Concord and Kearns acted on behalf of Rayka.

cation, it may be said that the principal objections concern the Government's alleged failure to prove a prima facie case of intent to defraud and the alleged admission of irrelevant and prejudicial preconspiracy and postconspiracy evidence against all the defendants. The emphasis placed by the various defendants in their attacks upon the Government's proof differs in some respects, however, and it will be necessary to treat the evidence as to certain defendants separately at times.

■ Count I of the indictment charged a conspiracy among the defendants to defraud Concord by having Hickey, Frank Graves, Heiderscheidt, and Kearns, who were all officers or directors of Concord at one time or another, wilfully misapply Concord's funds and wilfully share in the proceeds of Concord's mortgage loans on the Hartman farm and Schoolside. Count II charged that Hickey, aided and abetted by the other defendants, used his position as Concord's managing officer to misapply its funds by fraudulently causing the approval and disbursement of the loans knowing them to be inadequately secured. Count III charged that Hickey, as an officer of Concord, aided and abetted by the other defendants, fraudulently participated in the proceeds of the same loans to the extent of $250,000. All parties to this appeal are in agreement that conviction of the substantive crimes charged requires proof of an intent to defraud. It is also agreed that such an intent may be proved by circumstantial evidence.[23]

Defendant Hickey's basic reason for his contention that the prosecution failed to prove an intent to defraud as to him is that it was not shown either that he knew the loans were inadequately secured or that he concealed such knowledge from Concord. Hickey says that, far from

proving a conspiracy to defraud, the evidence merely demonstrated a good-faith, arm's-length transaction between the other defendants and him. The evidence, however, belies Hickey's present claims of ignorance and innocence.

Hickey had considerable experience in the field of real estate finance. He viewed the Hartman and Schoolside properties personally and observed their chief physical characteristics—they were vacant, unimproved acreages. Hickey put Brown's appraisals into the Concord files. He knew that these appraisals were based upon a valuation of the property as subdivided and improved. He knew that the property would be purchased with part of the loan proceeds and that $250,000 of the $350,000 would still be available for the purchase of Concord from him. Hickey argues that there was no proof that he knew about the lower appraisals given to the Graveses. Aside from the observation that his knowledge of the existence of the Duffy and Enright appraisals was a permissible inference,[24] specific knowledge of the rejected appraisals was unnecessary in view of his proven knowledge of other facts which placed the value of the property in question far below the amount of the loans.

■ The proof of Hickey's intent to defraud was sufficient to go to the jury. The evidence showed that all loan approvals at Concord during Hickey's administration followed directly from his submission and explanation of them to Concord's board of directors. The evidence also showed that Concord's directors approved a $350,000 construction loan to Wood-Stream on the basis of an application which never existed. Hickey knew that neither Wood-Stream nor the "substituted" borrower, Shur, was to receive the proceeds; his board of directors

23. The defendants repeatedly refer to the Government's burden of proof in terms of demanding the exclusion of every reasonable hypothesis other than guilt. We are not unmindful of this rule, particularly as it has been applied to cases involving circumstantial evidence, but note that it is but an alternative statement of the rule that the prosecution must prove guilt

beyond a reasonable doubt. United States v. Wroblewski, 105 F.2d 444, 449 (7th Cir. 1939).

24. Hickey was present when attorney Willens was falsely informed that Duffy had submitted an appraisal of $600,000 and Enright's name was mentioned.

did not. He knew that he would receive a $250,000 share of the funds disbursed from under a stack of escrows; his board of directors did not. In his brief, Hickey states that the directors of Concord were "fully informed of the facts as [he] knew them." The record indicates that the directors of Concord were "fully informed" of the facts only as Hickey presented them.

■ Defendants Frank and James Graves and Heiderscheidt challenge the Government's proof of a prima facie case on somewhat different grounds. They argue that the requisite intent to defraud was not proved (1) because the Hartman-Schoolside properties did in fact adequately secure the loans and (2) because the defendants in good faith believed that they did. The evidence, however, was ample for the jury to have found that these parcels were not of sufficient worth to secure a $350,000 land loan and that the defendants had knowledge of this fact.

The Government's proof of the value of the parcels securing the loans was based upon the appraisals and expert testimony of A.O.J. Baumann, John Enright, and George Duffy. Baumann and Enright appraised the Hartman farm at considerably less than $100,000, Duffy at between $155,000 and $185,000. Yet the farm stood alone as the security for a loan of $295,000. Enright valued Schoolside at $24,000. Yet Schoolside was used to secure a loan of $55,000. The Graveses' and Heiderscheidt's knowledge of all these facts is unquestioned. Their guilty knowledge of value is further shown by their efforts to secure appraisals of the properties as improved, their experience in the real estate market, their knowledge of the generally poor condition of the Hartman farm, and to some extent at least by the price at which Frank Graves was able to purchase the properties—a price well below even the lowest appraisals.

The defendants contend that their opinions of value merely differed from those of the witnesses produced by the Government "on the very subjective and ethereal matter of real estate valuation." To support this assertion of good faith, the defendants refer to the testimony of at least three witnesses produced by them who testified that the Hartman-Schoolside properties had a fair market value in excess of $400,000 based upon the "lot method" of valuation. The "lot method" is described by the defendants as a method of appraising vacant land which is proposed to be subdivided for residential purposes and which is located adjacent to existing residential subdivisions. The appraiser determines the number of lots which the vacant land under study will yield. He multiplies that number by the average price at which vacant lots in the adjoining subdivisions were sold after they were improved, and then deducts the estimated cost of installing the improvements made on the adjoining property. The resulting figure is the appraised valuation.[25]

Whatever its merit to builders and developers might be, the speculative and unrealistic character of "lot-method" appraisals in assessing the value of vacant land as security for mortgage loans is apparent. "Lot-method" appraisal is a reflection of a value which may be achieved at some time in the future when the land is subdivided, improved, and ready to be sold in individual residential lots. It does not reflect the present fair market value of the vacant land, that is, what it would bring if exposed for sale on the open market, with both buyer and seller acting without duress and with full knowledge of the facts. It is common knowledge that mortgage loans on real estate, to be adequately secured, must be based upon the present fair market value of the land. The loans must be granted in an amount sufficiently below fair market value to insure a recovery in the full amount of the loan should foreclosure

25. The defendants have gratuitously provided documentation of the widespread use of this method of appraisal in the Chicago area.

and sale become necessary through a default in repayment. The defendants must be charged with knowledge of these basic principles.

The objection of defendant Kearns to the Government's proof of his participation in the conspiracy presents another question. Kearns does not seriously challenge the fact that his actions contributed to the accomplishment of the purposes of the alleged conspiracy. He contends, rather, that there was no proof that his efforts were accompanied by knowledge of the criminal plan to which he was contributing.

Fitzgerald testified that Kearns was present when he visited the Hartman farm with Frank and James Graves and Heiderscheidt in August 1960 to discuss the development of that property.[26] This incident is relatively innocuous except insofar as it indicates Kearns' general familiarity with the farm and the designs of the Graves group toward it. Next, on September 6, 1960, Kearns placed some of his stock in escrow at the American National Bank. The stock was used as earnest money in the transfer of Concord from Hickey to Frank Graves, but the use to which the stock would be put did not appear in the escrow agreement signed by Kearns. The agreement, however, did contain an assignment of the beneficial interest in the Schoolside trust and referred to the Brown appraisal of that property. Kearns became a director of Concord when it changed hands on November 2, 1960 and continued in that capacity for approximately one year. In June 1961 he became the president of Rayka (the corporation which developed Schoolside, paid the loan from Concord thereon, and made interest payments on the Hartman loan). Kearns was present at the February 1962 meeting in Hickey's home during which Fitzgerald was urged to take the fifth amendment in connection with the FBI investigation of Concord. Finally, as president of Rayka, Kearns entered into the March 1963 extension agreement on the Hartman loan with Concord.

█ This recitation of the evidence against Kearns demonstrates a progressively increasing awareness of the circumstances under which the loans on the Hartman farm and Schoolside were made and Kearns' continued co-operation with the others in spite of it. The first meeting with Fitzgerald and the escrow agreement may perhaps not be sufficient proof of Kearns' knowing contributions to the conspiracy, nor does his directorship in Concord necessarily impart any unlawful agreement with the others. But these circumstances fit into an expanding pattern of participation which culminated in Kearns' activities as the president of Rayka, activities which, the jury could find, were consistent only with an underlying agreement to assist in the perpetuation of the fraud practiced upon Concord. In view of his prior activities, it is inconceivable that Kearns did not know, at the time Rayka made interest payments and entered into an extension agreement on the Hartman loan, who the former owners of the Hartman-Schoolside properties were or what they had done with the proceeds of the loans. The only reasonable inference is that Kearns knew that the obligations which Rayka had "assumed" the duty of paying (in exchange for the opportunity of developing the properties) were the obligations incurred by the Graveses in the purchase of Concord.

█ A conspirator need not participate in all the activities of the conspiracy, nor is it necessary that he become a member of the conspiracy at its inception. United States v. Lipsky, 309 F.2d 521, 522 (3d Cir. 1962), cert. denied, 371 U.S. 953, 83 S.Ct. 510, 9 L.Ed.2d 501 (1963). It is only necessary that he knowingly contribute his efforts in furtherance of it. McManaman v. United States, 327 F.2d 21, 25 (10th Cir.), cert. denied, 377 U.S. 945, 84 S.Ct. 1351, 12 L.Ed.2d 307 (1964). Of course, as Kearns points out,

---

26. Fitzgerald's initial hesitancy to include Kearns as a member of this delegation must be resolved in favor of the Government. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

a conspiracy may not be inferred from mere association, Panci v. United States, 256 F.2d 308, 312 (5th Cir. 1958), and the trial judge must guard against such a possibility by scrutinizing the evidence as to each defendant before submitting the case to the jury. United States v. Bufalino, 285 F.2d 408, 418 (2d Cir. 1960). But "the law rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their connections with it, without requiring evidence of knowledge of all its details or of the participation of others." Blumenthal v. United States, 332 U.S. 539, 557, 68 S.Ct. 248, 256, 92 L.Ed. 154 (1947).

Defendant Kearns also contends that his conviction cannot be sustained because the jury verdict of not guilty on the substantive counts of the indictment contradicts the verdict of guilty on the conspiracy count. Kearns' entry into the conspiracy was perhaps somewhat belated, and the jury may have concluded that his contribution to the conspiracy inhered more in the perpetuation of the fraud visited upon Concord than in the mechanics of the transfer of Concord itself. We need not speculate, however, on the manner in which the jury arrived at its verdict. Inconsistent jury verdicts on separate counts are generally permissible, even though the same evidence is offered in support of each count. United States v. De Lucia, 262 F.2d 610, 616 (7th Cir. 1958), cert. denied, 359 U.S. 1000, 79 S.Ct. 1136, 3 L.Ed.2d 1029 (1959).

In summary, the evidence, when considered in the light most favorable to the Government, established the conspiracy charged in the indictment and the knowing participation of each defendant in it. The evidence also established the guilt of those defendants convicted of the substantive offenses charged.

## II.

The next series of objections relates to the admission into evidence of preconspiracy and postconspiracy acts and declarations of various defendants.

The defendants first contend that the trial court erred in admitting evidence of the details of the acquisition of the Hartman farm by Frank and James Graves. They say that no conspiracy could have been formed until the meeting of Hickey, James and Frank Graves, and Heiderscheidt in June 1960. In spite of this, the defendants argue, the trial court admitted evidence of transactions occurring during the spring of 1960 among Frank and James Graves, Coquillard, and Hartman. These transactions, they say, were irrelevant to the crimes charged and, since they tended to show that Coquillard and Hartman were duped into giving up their interests in the farm, were highly prejudicial.

Although the negotiations for the purchase of the farm began prior to the formation of the conspiracy, they were not concluded until the conspiracy was well under way, that is, until after money was disbursed from an escrow containing the proceeds of the Concord loans on October 7, 1960. Part of this money was used to complete the acquisition. The purchase of the Hartman farm and its value were, in turn, important issues in the case. The tenuousness of the control possessed by the Graveses over the trust in which the farm was being held directly affected the security which Concord obtained by taking a mortgage on the property. An understanding of the interest which the borrowers had in the property used to secure the loans was relevant. Therefore, a disclosure of the entire series of transactions dealing with its purchase was permissible. The letter of October 7, 1960 from Hartman and Coquillard withdrawing an earlier letter of protest to the trustees of the farm, for example, had to be placed in the context in which it was written. The transactions between the Graveses and Coquillard and Hartman also bore upon the value attributed to the farm by the defendants themselves. In short, the entire history of the acquisition was woven into the conspiracy. Since the consummation of the purchase was accomplished in furtherance of the conspiracy, the

**140**

events leading up to the acquisition were adopted and became part of the conspiracy. The overlapping events of early 1960 are not similar to the disjointed pre-conspiracy occurrences present in the cases cited by the defendants. Here, the jury could reasonably infer that all the defendants, with the possible exception of Kearns, were familiar with the problems relating to the acquisition of the farm and approved the purchase nonetheless.

 Furthermore, events which occur prior to the commission of a crime are often relevant to an understanding of the nature of the crime itself. "How far back of the commission of the crime one may go is a matter of degree, and within the general control of the judge over the relevancy of evidence." United States v. Dennis, 183 F.2d 201, 231 (2d Cir. 1950), aff'd, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951). Here we do not think that the district judge erred by admitting evidence of the continuing series of transactions relating to the purchase of the Hartman farm. The earlier negotiations merged with acts done in furtherance of the conspiracy and were relevant to an understanding of them. They were admissible against all the conspirators once a prima facie conspiracy was proved. Kearns, who may have entered the conspiracy at a later date, took the conspiracy as he found it. When he joined and actively participated in it he adopted the previous acts and declarations of his fellow conspirators. United States v. Bucur, 194 F.2d 297, 302 (7th Cir. 1952). These acts became admissible against him, at least as they tended to show the nature and objectives of the conspiracy he joined. United States v. Witt, 215 F.2d 580, 583 (2d Cir. 1954); United States v. General Motors Corp., 121 F.2d 376, 408 (7th Cir.) cert. denied, 314 U.S. 618, 62 S.Ct. 105, 86 L.Ed. 497 (1941).

 Next the defendants contend that the district court erred in admitting evidence of events which allegedly occurred after the conspiracy ended. They correctly state the general rules that a conspiracy terminates when its central objective is achieved and that no subsidiary conspiracy to conceal the crime may be implied. Since the central objective of the conspiracy charged in this case was the fraudulent transfer of control in Concord, so the argument goes, the conspiracy ended when the transfer took place on November 2, 1960. The defendants therefore conclude that all evidence of acts and declarations occurring after that date should have been limited to the particular actors and declarants, relying upon Grunewald v. United States, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), Lutwak v. United States, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953), and Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949).

The conspiratorial period lies at the heart of the problem. If the conspiracy ended as asserted by the defendants, there would be no question, in light of the decisions just referred to, that the trial court committed prejudicial error. A great deal of evidence concerning the post-November 1960 activities of various defendants was eventually admitted as to all of them. The formation of Rayka Corporation and its payment of interest on the loans, the efforts of Frank and James Graves and Heiderscheidt to rearrange the trust files relating to Schoolside, and the attempts to persuade Fitzgerald not to cooperate with the FBI provide notable examples.

The Government's position, however, is that the conspiracy continued until the indictment was returned in January 1964.[27] The Government contends that this is not the ordinary case wherein concealing the accomplishment of the central objective of the conspiracy is merely incidental to the original unlawful agreement. Here, the Government argues, the conspiracy necessarily encompassed the clandestine

---

27. The indictment so charged. The first count lists overt acts in furtherance of the conspiracy as late as July 1963.

repayment of the loans from Concord, thus distinguishing this case from the *Grunewald, Lutwak,* and *Krulewitch* decisions.

The duration of a conspiracy depends upon the facts of the particular case, that is, it depends upon the scope of the agreement entered into by its members. Generally, the conspiracy ends when its principal objective is accomplished because no agreement to retain secrecy after the achievement of the unlawful end can be shown or implied by mere "acts of covering up." Thus in Grunewald v. United States, supra 353 U.S. at 402, 77 S.Ct. at 972, the Supreme Court stated, "Acts of covering up, even though done in the context of a mutually understood need for secrecy, cannot themselves constitute proof that concealment of the crime after its commission was part of the initial agreement among the conspirators." But the fact that the "central objective" of the conspiracy has been nominally attained does not preclude the continuance of the conspiracy. Where there is evidence that the conspirators originally agreed to take certain steps after the principal objective of the conspiracy was reached, or evidence from which such an agreement may reasonably be inferred, the conspiracy may be found to continue. Atkins v. United States, 307 F.2d 937, 940 (9th Cir. 1962) ; cf., United States v. Allegretti, 340 F.2d 254, 256 (7th Cir. 1964), cert. denied, 381 U.S. 911, 85 S.Ct. 1531, 14 L.Ed.2d 433 (1965). The cases cited by the defendants do not hold otherwise. The crucial factor is the necessity for some showing that the later activities were part of the original plan. In this case there was such a showing.

The defendants were charged with a conspiracy to fraudulently cause the issuance of loans in order that they might shift control in a financial institution. The *modus operandi* of the conspiracy was to disguise the nature of the loans and their borrowers. If the plan was to be successful, it is logical that it included some means for repayment. Repayment was in the interest of all the participants. As the Government suggests, default on these loans would have brought them into immediate question by those whose business it is to conduct periodic examinations of the lender. The record contains ample evidence that repayment of the loans was preconceived.

The relationship of the conspirators to Fitzgerald is revealing. Fitzgerald was hamstrung by his signature on the many documents submitted to him. He was ostensibly designated as the "borrower" on the mortgage loans, but he was never led to believe that he would receive the proceeds of mortgage loans. Instead, he was led to believe that he was to be the developer of the Hartman farm through construction loans from Concord. The logical conclusion is that the combination of these construction loans and sales of the improved properties to the ultimate consumers could eventually be manipulated to eradicate the mortgage loan debt. The formation of Rayka reflects the same sort of arrangement, in all probability to fill the void created by Fitzgerald's difficulties. Rayka attempted to repay the Schoolside and Hartman Loans by the development and sale of these properties through a program of construction loans from Concord. The conspirators knew, of course, that the new owners of Concord would be able to direct its activities in a manner consistent with such a plan.

It was reasonable to conclude, therefore, that the conspiracy was designed to and did continue after the transfer of Concord was effectuated. A definite pattern of concealment through diversion and subterfuge was established. The acts and declarations cited by the defendants as prejudicial to nonparticipants occurred during and were in furtherance of the conspiracy, and therefore were admissible as to all defendants. The attempts to alter trust records and to keep Fitzgerald quiet have an element of spontaneity about them, but in view of what has been said, they were within the conspiratorial period and were in furtherance of the conspiracy.

# 142

## III.

We now address ourselves to a number of unrelated issues posited by the defendants, which must be treated separately.

The defendants contend that the trial court unduly restricted attempts to prove their good-faith belief in the value of the Hartman farm, both in the presentation of expert testimony and in the cross-examination of the Government's experts. Generally speaking, the restrictions complained of relate to the defendants' efforts to permit witnesses to testify as to the sales price of individual improved lots in subdivisions adjoining the farm. The trial court refused to allow such testimony and also refused to allow hypothetical valuation of the farm as subdivided and improved.

The obvious trial strategy of the defendants was to justify a valuation of the farm according to the "lot method." We have already indicated that this is an unrealistic method of valuation when the purpose of the valuation is to determine the present fair market value of property to be used as collateral for a land loan. Individual lot sales, as ingredients of the "lot method," exhibit the same objectionable quality when attempted to be used as evidence of the value of comparable property. Evidence of sales of land in neighboring areas may be used as tending to prove the value of the subject land only when it is first shown that the sales were of similar property, similarly situated.[28] The trial judge must be given considerable discretion in determining whether the conditions of similarity have been met.[29]

The defendants here did not satisfy the trial court either that the general physical characteristics of the adjoining subdivisions were similar or that the sales of improved lots located therein were sufficiently relevant to the acreage valuation of the farm to permit their admission. The value of the improved property adjoining the Hartman farm was relevant only insofar as its improved character affected the value of the farm as a whole. The record shows that the Government's experts all considered the farm's location near improved, subdivided property in appraising the farm itself, but did not consider the selling price of the individual improved lots to be of much assistance in this regard. Although a broad scope of exploration of land value should be permitted in a criminal case involving the defense of good faith, no abuse of the trial court's discretion has been shown here.

Defendants Hickey, Frank Graves, and James Graves next argue that the district court and Government counsel hampered and belittled their defense of reliance upon the advice of counsel in the transfer of Concord. In order to avail themselves of this defense, it was necessary for the defendants to show that they had made a full disclosure to their attorneys of all the facts pertaining to the transaction. Bisno v. United States, 299 F.2d 711, 720 (9th Cir. 1961), cert. denied, 370 U.S. 952, 82 S.Ct. 1602, 8 L.Ed.2d 818 (1962). All three defendants testified to reliance upon counsel, but none of them testified to a disclosure of many of the facts which were proved

28. United States v. 190.71 Acres of Land, 300 F.2d 52, 60 (7th Cir. 1962); Fairfield Gardens, Inc. v. United States, 306 F.2d 167, 172–173 (9th Cir. 1962).

29. Forest Preserve District v. Caraher, 299 Ill. 11, 14–15, 132 N.E. 211, 212 (1921), contains a discussion pertinent to the situation in the present case:

Evidence of voluntary sales of lands in the vicinity and similarly situated is admissible in evidence to aid in estimating the value of the land * * *, but the party offering the proof must first show that the lands so sold were similar in locality and character to the land in question. * * * No positive rule can be laid down as to the degree of similarity or the nearness of time and distance required to make such sales competent as evidence, and the question must first be submitted to the trial judge and must rest largely within his discretion. * * * Evidence of sales of property which is not similar * * * can only lead to the investigation of numerous collateral issues and would certainly tend to mislead the jury.

by the Government in its case-in-chief. The defendants claim that they were prevented from doing so by court and prosecution alike. The record does not support them. It shows only that the trial court, though somewhat sharply at times, sustained objections to improper questions asked by defense counsel. The record also shows that the Government's cross-examination of Frank Graves, objected to by the defendants as argumentative and containing false assertions of fact, was properly designed to discover whether Graves had informed attorney Woodward of the manner in which the loans from Concord were being disguised. Furthermore, the defense of reliance upon counsel was materially weakened when attorney Willens, called by the defense, testified that these defendants told him appraiser Duffy had valued the Hartman farm at $600,000, an obvious and material misrepresentation.

The admissibility of the notes of an accountant under the federal business records statute, 28 U.S.C. § 1732, is the defendants' next assignment of error. Robert Squires, an accountant, participated in the audit of Concord beginning on September 30, 1960. When the loan-confirmation letter sent to Wood-Stream Construction Company elicited a negative reply, Squires returned to Concord to reexamine the files. During his reexamination, Squires made notes outlining the contents of Hartman-Schoolside loan files. The notes were used in the preparation of the audit report of the firm which employed Squires and were kept with its records. At the trial Squires had no independent recollection of the facts and the notes did not refresh his recollection. The Government then attempted to have the notes admitted as Squires' recorded past recollection. The court, however, granted a motion by the defendants to strike his testimony regarding the contents of the loan files for lack of a proper foundation. Following this rejection, the Government proceeded to lay a foundation for the admission of the notes as business records, and they were so admitted.

The damaging character of the notes lay in their reflection of the contents of Concord's Hartman-Schoolside loan files as of October 12, 1960. The files, as reflected in Squires' notes, indicated that construction loans on the subject properties were being made to Shur Construction Company for the purpose of making the improvements listed in the Brown appraisals. Squires was also permitted to testify that he customarily included all appraisals contained in such files in his notes, and that since the Brown appraisals were the only ones mentioned in his notes, Concord's files contained no others on the date of his inspection. This testimony was significant in showing that the Brinkman appraisals, relied on by the defendants, were not in the files two weeks after the loans had been disbursed.

Section 1732 of the Judicial Code provides for the admission of a writing made as a memorandum of "any act, transaction, occurrence, or event * * * if made in regular course of any business." This section was designed to permit the admission of business memoranda which impart a circumstantial guarantee of trustworthiness. The test is one of reliability. The summary notes in the instant case, introduced by way of the foundation testimony of the impartial professional person who prepared them, meet this test.

The defendants contend that Squires' notes were not "made in [the] regular course of business" because such notes were required by his auditing firm only when loan-verification letters produced certain unfavorable responses. But the fact that such notes were taken only under certain conditions does not mean that the note-taking was not a matter of routine for the auditing firm, that is, "in [the] regular course of [its] business." Squires testified that his was the normal procedure, given a failure in loan-confirmation.

The defendants next object that the notes were inadmissible because they were "incomplete" summaries based upon the discretion of their author. Squires

testified that he summarized all the documents in Concord's files which were "important" to a determination of who the borrowers were. The element of choice, in Squires' own words, related only to "minor matters such as insurance premiums and things of that nature," and in no way affected the accuracy of the information which he did summarize. We do not think that the discretion exercised by Squires, as thus admitted, destroyed the reliability of the notes.[30] The purpose of section 1732 would be defeated if, as the defendants contend, the admissibility of the "memorandum" were to depend upon whether it constitutes a precise reproduction of the "act, transaction, occurrence, or event" of which it is evidence. Cf., McDaniel v. United States, 343 F.2d 785, 788–789 (5th Cir.), cert. denied, 382 U.S. 826, 86 S.Ct. 59, 15 L. Ed.2d 71 (1965); Neely v. United States, 300 F.2d 67, 74, 93 A.L.R.2d 718 (9th Cir.), cert. denied, 369 U.S. 864, 82 S.Ct. 1030, 8 L.Ed.2d 84 (1962).

The defendants contend that the trial court erroneously instructed the jury as to the elements necessary for a "misapplication" of funds in violation of 18 U.S.C. § 657, charged in count II of the indictment. The court instructed the jury on this count as follows:

(1) Three essential elements are required to be proven beyond a reasonable doubt in order to establish the offense charged in Count II of the indictment:

First, that the defendant was an officer, agent or employee of or was connected in any capacity with a savings and loan association, the accounts of which were insured by the Federal Savings & Loan Insurance Corporation;

Second, that while being so connected with the association, he misapplied moneys or funds belonging to or entrusted to the care of the association;

Third, that the defendant did such act knowingly, wilfully, and with the intent to injure or defraud the association.

(2) The term, ladies and gentlemen of the jury, "misapplication" as used in this statute means the unlawful taking or conversion by a person to his own use or the use of someone else of the money and funds of a savings and loan association.

(3) Misapplication under this statute may be committed in any or all of the following ways: 1, by an officer of a savings and loan association causing a loan to be made to his own benefit and concealing his interest in the loan from the association; 2, by an officer of a savings and loan association causing a loan to be made, knowing that the loan is insufficiently secured and concealing that fact from the association; 3, by an officer of a savings and loan association causing a loan to be made knowingly to a fictitious borrower.

(4) If an intent to injure or defraud a savings and loan association when the loan is made is shown, it matters not whether the association will lose any part of the loan. It is the unlawful intent to injure or defraud that is the essence of this offense.

The defendants challenge part (3) of the instruction. Their position is that it purports to render the adequacy of the lending institution's security immaterial if either of the other stated conditions obtains. They say that section 657 does not prohibit surreptitious loans to officers of an insured institution or prohibit an officer from causing such an institution to make loans to a fictitious borrower. The defendants argue that the instruction thus varied materially from the crime charged and rendered count II duplicative of count III, which charged fraudulent participation in the loan proceeds in violation of 18 U.S.C. § 1006.

We do not agree with the defendants' contentions. In the circumstances of this case fraudulent "misapplication" could be committed either by

**20.** The manner in which Squires conducted his note-taking was fully explored on cross-examination.

an officer causing a loan to be made to a fictitious borrower or by an officer causing a loan to be made to his own benefit and concealing his interest in the loan. Concealing the identity of the borrower may or may not have the effect of injuring the lending institution. But the institution ordinarily looks to the borrower for repayment. Here the borrower was actually to become the party in charge of enforcing the loan. The risk to the lender is obvious, and the requisite intent to injure or defraud [31] may be inferred from knowledge of this fact and misrepresentation of it. The risk of injury is similarly apparent when an officer causes a loan to be made for his own benefit through misrepresentation. Hargreaves v. United States, 75 F. 2d 68, 72 (9th Cir.), cert. denied, 295 U.S. 759, 55 S.Ct. 920, 79 L.Ed. 1701 (1955). Where part of the proceeds of a loan are siphoned to an officer under the pretense that the loan is for construction purposes, as was done here, the officer is guilty of misapplication of the funds of the lending institution. Nor did the elements of the crime charged in count III duplicate the charge in count II. The gravamen of the crime defined in section 1006 is the fraudulent receipt of benefits by an officer in a loan made by his institution; the gravamen of section 657 is the fraudulent conduct of an officer in misapplying the funds of his institution, which may be accomplished by a variety of means, including causing a loan to be made (in which the officer may later participate) under dishonest circumstances. Our discussion on this point answers the argument that the instruction broadened the indictment.[32] The instruction merely defined "misapplication" in light of the evidence presented relating to the charge contained in count II.

The defendants contend that they were deprived of their constitutional right to cross-examine adverse witnesses at the time when such witnesses became "adverse." During the Government's case-in-chief, the testimony of each witness was limited by the court to the defendant or defendants with whom the testimony was directly concerned. Following the direct examination of each witness, counsel for each defendant was given the opportunity to cross-examine. The opportunity was accepted in many instances and declined in others. At the close of the Government's evidence, the court, concluding that a prima facie case of conspiracy had been proved, granted the Government's motion to admit all the evidence against all the defendants. Each defendant now urges that a right to cross-examine all the witnesses whose testimony had previously been limited to other defendants arose when the motion was granted and that the failure to make these witnesses available for cross-examination at that time was error.

The defendants are mistaken. Their right to cross-examine each Government witness, traditionally and by practical necessity, arose when that witness completed his direct examination. Failure to cross-examine at that time was a waiver of the right to do so. In the trial of a conspiracy case, each witness is offered for a dual purpose: first, to show individual participation in the conspiracy by its various members, and second, to prove the conspiracy itself. Even though the testimony of a witness is temporarily limited to the first purpose, his testimony is nonetheless offered for the second purpose. Defendants' counsel were charged with this knowledge. They deliberately took the risk that the limitation would be removed whenever

31. The jury was properly told that an essential element of the crime was that the acts constituting "misapplication" had to be done "with intent to injure or defraud the association." The challenged portion of the instruction, part (3), must be read in context with the foregoing language.

32. It should be observed that the defendants did not refer to a broadening of the indictment in their objection to the instruction.

the Government made a prima facie showing of the existence of a conspiracy.

 Defendant Hickey charges that the district court erred in refusing to grant his motion for severance. Hickey was charged as the primary defendant in all three counts. The evidence sustained the charge. Even if Hickey were tried separately, all of the evidence relating to the conspiracy would be admissible against him. The district judge did not abuse his discretion in denying a severance.

We have discussed in detail the principal issues urged for reversal. The defendants have presented a number of other issues. We have considered them and conclude without further discussion that they have no substance.

The judgments of conviction are affirmed.