In re VERILINK CORPORATION,
a Delaware Corporation, and
Affiliates, Debtor(s).

Darryl S. Laddin, as Trustee for the
Liquidating Estate of Verilink Corpo-
ration and Larscom Incorporated,
Plaintiff,

v.

Leigh S. Belden, Steven C. Taylor, Timo-
thy Anderson, C.W. Smith, Powell
Goldstein LLP, and Raymond James
& Associates, Inc., Defendants.

Bankruptcy Nos. 06–80566–
JAC–11, 06–80567.
Adversary No. 08–80072–JAC.

United States Bankruptcy Court,
N.D. Alabama,
Northern Division.

April 15, 2009.

David J. Worley, James M. Evangelista, Page Perry LLC, Rickman P. Brown, Scott A. Schweber, Scott E. Tinnon, Dietrick Evans Scholz & Williams LLC, Atlanta, GA, Glen Marshall Connor, Richard P. Rouco, Birmingham, AL, for Plaintiff.

Caroline A. Fuller, John S. Lutz, Michael R. McCurdy, Fairfield and Woods PC, Denver, CO, Harriot Ivy, Timothy M. Lupinacci, Baker Donelson, W. Patton Hahn, Christopher L. Hawkins, Bradley Arant Rose & White, Bradley Richard Hightower, Christian & Small LLP, Daniel D. Sparks, Birmingham, AL, Donald A. Loft, Atlanta, GA, Daniel D. Sparks, Christian & Small, LLP, Birmingham, AL, for Defendants.

### ORDER GRANTING MOTION TO DISMISS OF RAYMOND JAMES & ASSOCIATES, INC.

JACK CADDELL, Bankruptcy Judge.

This is an action brought by the liquidating trustee ("Trustee") of a bankrupt company, Verilink Corporation ("Verilink") against various officers and directors, legal counsel, and an investment banking firm,

in relevant part, arising out of the acquisition by Verilink of Larscom Incorporated ("Larscom"). The Trustee contends that the acquisition of Larscom caused the financial demise of Verilink. The Trustee also asserts insider trading claims against the officers and directors, but those claims are not presently at issue. The case comes before the Court on a Motion to Dismiss filed by Defendant Raymond James & Associates, Inc. ("Raymond James"). The Trustee's allegations against Raymond James, as presently pled, are set forth in the Corrected Amended Complaint (the "Corrected Complaint"). For the reasons set forth below, the Motion to Dismiss is GRANTED.

## I. BACKGROUND

Raymond James is a Florida corporation that provides various investment banking services, among other things. Verilink, a public company, was primarily a manufacturer and distributor of telecommunications components. In late 2003, Verilink began reevaluating a potential acquisition of Larscom, a company that also manufactured and marketed telecommunication components. By March 17, 2004, Verilink had been engaged in discussions with Larscom about a potential acquisition. In a Verilink board meeting held that day, some of the key terms of the proposed acquisition were discussed along with a proposal to engage Raymond James to provide investment banking services, including, but not limited to, a fairness opinion in connection with an offer to purchase Larscom. Raymond James had been previously engaged by Verilink to assist on one earlier acquisition.

Verilink's board eventually approved the retention of Raymond James and an engagement agreement ("the Contract," Doc. 63–1) was executed on or about March 25, 2004. Among other things, the Contract provides that:

> ... Raymond James is an independent contractor and that their respective rights and obligations as set forth herein are contractual in nature. Accordingly, [Verilink] disclaims any intention to impose fiduciary or agency obligations on Raymond James by virtue of the engagement contemplated by this Agreement, and Raymond James shall not be deemed to have any fiduciary or agency duties or obligations to ... [Verilink].

Contract, Section 5(c).

On July 28, 2004, Verilink completed its acquisition of Larscom by issuing stock and assuming debt. For almost two years after the acquisition, Verilink and Larscom continued in operation. Then, on April 9, 2006, they filed separate petitions for reorganization under Chapter 11 of the Bankruptcy Code and sought joint administration of their petitions. On May 4, 2006, this Court appointed Darryl S. Laddin to serve as counsel to the Official Unsecured Creditors' Committee.

Verilink filed a Second Amended Joint Plan of Reorganization (the "Plan") and related Disclosure Statement on December 7, 2006. On January 31, 2007, this Court entered an Order confirming the Plan, which became effective on February 13, 2007. Under the Plan, Mr. Laddin was appointed as the Liquidating Trustee.

As Liquidating Trustee, Mr. Laddin filed his original complaint in this adversary proceeding on April 8, 2008 (one day short of two years after the original bankruptcy filing or Order for Relief) against certain former Verilink officers and directors for claims unrelated to the Larscom acquisition. The Trustee filed an Amended Complaint on September 29, 2008 adding Raymond James and the Powell Goldstein law firm, Verilink's legal counsel, as defendants and asserted new

claims based on the theory that the acquisition of Larscom caused Verilink's collapse due to Larscom's allegedly poor financial performance. The Trustee did not serve the Amended Complaint on Raymond James. The Trustee filed the Corrected Complaint on October 30, 2008.

On February 12, 2009, the Trustee filed a motion for leave to file a Second Amended Complaint where he alleged, for the first time, that Defendant Powell Goldstein fraudulently concealed certain Verilink documents from the Trustee until July 2008 which, among other things, allegedly tolled the running of the statute of limitations against Raymond James.

## II. MOTION TO DISMISS STANDARD

Federal Rule of Civil Procedure 12(b)(6) requires courts to dismiss a cause of action if, as a matter of law, a plaintiff has failed to state a claim for which relief may be granted. In ruling on a motion to dismiss, courts accept a complaint's allegations as true and construe them in the light most favorable to the plaintiff. *See Hill v. White*, 321 F.3d 1334, 1335 (11th Cir.2003). In order to survive a motion to dismiss for failure to state a claim, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). Under this standard, "[f]actual allegations must be enough to raise a right to relief above the speculative level" and it is not sufficient that the pleadings merely leave "open the possibility that a plaintiff might later establish some set of undisclosed facts to support recovery." *Id.* at 1965, 1968.

## III. DISCUSSION

The Corrected Complaint fails to state any claim against Raymond James upon which relief can be granted for numerous reasons, including but not limited to the following.

## A. THE DOCTRINE OF *IN PARI DELICTO* BARS ALL CLAIMS AGAINST RAYMOND JAMES

The doctrine of *in pari delicto* is an equitable principle that provides "a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing." Black's Law Dictionary 806–07 (8th ed.1999). It is a common law defense that "derives from the Latin, *in pari delicto potior est conditio de-fendentis:* 'In a case of equal or mutual fault ... the position of the [defending] party ... is the better one.'" *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985). The doctrine serves important public policy interests, that is, "courts should not lend their good offices to mediating disputes among wrongdoers" and "denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality." [1] *Id.*

▬ The Eleventh Circuit and other federal appellate courts to have considered the issue have determined that the defense of *in pari delicto* precludes, as a matter of law, a bankruptcy trustee from asserting claims against a third-party service provider that allegedly facilitated wrongdoing committed by former management for the benefit of the debtor, even if the alleged misconduct also benefited the individual wrongdoers.[2] *See Edwards*, 437 F.3d at

---

**1.** Raymond James maintains that it engaged in no wrongdoing whatsoever, which may well be true, but that need not be dealt with in the context of this Rule 12(b)(6) motion.

**2.** Imputation of wrongdoing by an agent to

1149–52; *Nisselson v. Lernout,* 469 F.3d 143, 151–58 (1st Cir.2006); *Baena v. KPMG,* 453 F.3d 1, 6 (1st Cir.2006); *Grassmueck v. Am. Shorthorn Ass'n,* 402 F.3d 833, 837 (8th Cir.2005); *Official Comm. of Unsecured Creditors of Color Tile v. Coopers & Lybrand, LLP,* 322 F.3d 147, 158–66 (2d Cir.2003); *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.,* 267 F.3d 340, 356–57 (3d Cir.2001); *Terlecky v. Hurd (In re Dublin Sec.),* 133 F.3d 377, 381 (6th Cir.1997); *Sender v. Buchanan (In re Hedged–Inv. Assocs.),* 84 F.3d 1281, 1285 (10th Cir.1996); *see also* Samuel C. Wasserman, Note, *Can the Trustee Recover? Imputation of Fraud to Bankruptcy Trustees in Suits Against Third–Party Service Providers,* 77 Fordham L.Rev. 365 (2008).

In the leading Eleventh Circuit case, the Trustee (Darryl Laddin, who is also the Liquidating Trustee in this action) of a debtor-corporation, ETS Payphones, Inc. ("ETS"), that had operated a Ponzi scheme, sued numerous third parties, including three banks that had served as custodians for investor funds from individual retirement accounts that were later transferred to ETS. *Edwards,* 437 F.3d at 1148. The banks moved to dismiss under Rule 12(b)(6), arguing that Mr. Laddin's claims were barred by the doctrine of *in pari delicto,* among other things, and the district court granted their motion. *Id.* at 1148–49.

Laddin appealed and argued to the Eleventh Circuit that the knowledge and wrongs of ETS were not imputable to him as a bankruptcy trustee. The Eleventh Circuit rejected his arguments, holding that under 11 U.S.C. § 541(a), Laddin could only assert claims that the debtor itself could have asserted at the time of the bankruptcy filing. Accordingly, the Trus-

---

the debtor-corporation will not occur if the agent was engaged in fraud or self-dealing entirely adverse to the corporate principal. *See Liquidation Comm'n of Banco Intercontinental, S.A. v. Renta,* 530 F.3d 1339, 1354–55 (11th Cir.2008). This so-called "adverse interest" exception is narrow and only applies when the individual wrongdoer/agent has wholly abandoned any corporate purpose, even if the agent's purpose is misguided or even fraudulent to the point of ultimately causing the company's failure. *See South-Trust Bank v. Jones, Morrison, Womack & Dearing, P. C.,* 939 So.2d 885, 905–06 (Ala. Civ.App.2005) ("[A] principal is liable for the intentional torts of its agent—even if the agent's acts were unknown to the principal, were outside the scope of the agent's authority, and were contrary to the principal's express directions—if the agent's acts were in furtherance of principal's business and not wholly for the gratification of the agent's personal objectives."); *see also, e.g., Nisselson v. Lernout,* 469 F.3d at 156–57 & n. 4 (noting that corporation can benefit from fraud, even though that fraud may cause corporation's demise if uncovered); *Claybrook v. Broad and Cassel, P.A. (In re Scott Acquisition Corp.),* 364 B.R. 562, 568–73 (Bankr.D.Del.2007) ("ad-

verse interest" exception is "only applicable when the agent is acting entirely adverse to the principal, and the principal is in no way benefitting from the agent's actions"; exception is inapplicable even when benefits to corporation "may seem somewhat trivial considering the alleged grandiose benefits" received by corporate insiders). In this case, the Trustee's allegations regarding the actions of the Verilink Defendants as to the Larscom transaction fall far short of the sort of looting and self-dealing required to establish the "adverse interest" exception. Thus, the knowledge and conduct of the Verilink Defendants, as agents for their corporate principal, is fully imputable to the Trustee, who merely stands in the shoes of Verilink. *See Edwards,* 437 F.3d at 1150; *In re Scott,* 364 B.R. at 568–73; *Seidman & Seidman v. Gee,* 625 So.2d 1, 2–3 (Fla.Dist.Ct.App.1992) (reversing jury verdict and granting judgment as a matter of law to accounting firm; corporate officer's fraud was intended to benefit corporation, even though fraud ultimately caused company to fail, and was thus imputable to corporation, which was absolute defense to action against its accounting firm for negligent failure to discover the fraud).

tee in this case can only assert such claims against Raymond James that Verilink could have asserted pre-bankruptcy and all those claims would have been barred, as a matter of law, under the doctrine of *in pari delicto*, because the knowledge and conduct of Defendants Leigh S. Belden (President, Chief Executive Officer and a Director), Steven C. Taylor (Chief Technical Officer, Vice Chairman and a Director) and C.W. Smith (either Vice President, Chief Financial Officer, Corporate Controller and/or Secretary) (collectively the so-called "Verilink Defendants") is fully imputable to Verilink. *See Edwards*, 437 F.3d at 1150; *In re Scott*, 364 B.R. at 568–73; *Brandt*, 1997 WL 469325, at *3; *Stone*, 771 So.2d at 457 *Gee*, 625 So.2d at 2–3.[3]

**B. THE TRUSTEE'S OWN PLEAD-INGS NEGATE PROXIMATE CAUSE.**

 Each cause of action against Raymond James is based on the theory that Verilink should not have purchased Larscom, as if Raymond James caused that transaction to occur. But the Corrected Complaint alleges that the Verilink Defendants were bound and determined to proceed with the Larscom acquisition as a matter of corporate survival. (*Id.* at ¶¶ 7,

8, 10.) For instance, the Trustee alleges that the Verilink Defendants had an intent "to close on the Larscom transaction no matter what." (*Id.* at ¶ 92.) Similarly, the Trustee alleges that the Verilink Defendants were going "to close on the Larscom transaction at any cost in order to continue to fulfill the Verilink Defendants' 'time frame doorstep' acquisition strategy." (*Id.* at ¶ 169.) The Trustee makes this very same statement in his opposition brief. (Pl. Br.[4] at 4 ("[T]he Verilink Defendants [were going] to close on the Larscom transaction at any cost under their time-frame doorstep strategy.").) According to the Trustee, Verilink management was so bound and determined to complete the acquisition that they allegedly presented it to the shareholders in an unreasonably good light and actually withheld negative information. (*Id.* at ¶¶ 136 & 138.) All of these statements constitute binding judicial admissions in this case.

In *Laddin v. Edwards*, 2006 WL 1097491 (N.D.Ga. Apr.21, 2006), Darryl Laddin, as Trustee, sued three lawyers who had served as outside counsel to ETS.[5] The trial court determined that "the knowledge and conduct [of Charles Edwards ("Edwards"), ETS' Chief Executive

---

**3.** *See* Ala.Code § 8–2–8 (2009) ("As against a principal, both principal and agent are deemed to have notice of whatever either has notice of and ought in good faith and the exercise of ordinary care and diligence to communicate to the other."); *see also, e.g.*, *Stone v. Mellon Mort. Co.*, 771 So.2d 451, 457 (Ala.2000) ("An agent's knowledge can bind the principal if the agent acquired the knowledge within the line and scope of his authority and the knowledge relates to the very matter coming within his authority."); *Sec. Title Guar. Corp. of Baltimore v. GMFS, LLC*, 910 So.2d 787, 792 (Ala.Civ.App.2005) (rejecting argument of limited application of Section 8–2–8; even if agent was not a general agent, agent's knowledge was imputable to principal); *Nat'l Sec. Fire & Cas. Co. v. Coshatt*, 690 So.2d 391, 393 (Ala.Civ.App.1996) (under

Section 8–2–8, "principal received notice when its agent received notice"); Restatement (Third) of Agency § 5.03 (2006) ("For purposes of determining a principal's legal relations with a third party, notice of a fact that an agent knows or has reason to know is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal. . . .").

**4.** "Pl. Br." refers to Doc 81, "Plaintiff's Brief in Opposition to Raymond James & Associates, Inc.'s Motion to Dismiss Plaintiff's Corrected Amended Complaint" filed on 2/9/09.

**5.** This is a subsequent trial court decision on a motion for summary judgment brought by others defendants in the same Ponzi scheme case discussed above.

Officer] in the payphone Ponzi scheme shall be imputed to ETS ... [and that] "the Plaintiff Trustee stands in the shoes of the debtor with regard to both causes of action belonging to the debtor and any defenses that could have been raised against it." *Id.* In allegations that are similar to the allegations the Trustee has made in this case against Raymond James and Verilink's outside counsel Powell Goldstein, the same Trustee in *Laddin* alleged that "the Defendants had a specific duty to warn ETS against the acquisition of another payphone company, Phoenix, and to withdraw from the transaction because [one of the lawyers] also represented Phoenix and knew about an SEC investigation involving it." *Id.* at *3. The *Laddin* Court found these charges legally insufficient because it was undisputed that Edwards "was intractable in his determination to complete this acquisition." *Id.* Accordingly, the *Laddin* Court held that "the Plaintiff ha[d] failed to demonstrate that this alleged breach was the proximate cause of any injury." *Id.; see also e2 Creditors Trust v. Stephens, Inc. (In re e2 Communications, Inc.)*, 354 B.R. 368, 399–400 (Bankr.N.D.Tex.2006) (in adversary proceeding brought by litigation trustee, determining that alleged breaches of fiduciary duty on part of investment bank/financial advisor were not proximate cause of debtor's damages). The same facts and circumstances that required dismissal of all the Trustee's claims in *Laddin* also require dismissal of all his claims against Raymond James in this case.

### C. ALL TORT CLAIMS ARE BARRED BY THE STATUTES OF LIMITATIONS

■ All of the Trustee's claims in this case are based on state law. Thus, this Court must apply the choice of law of rules of the state in which it sits. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487,

61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Randolph v. TVA,* 792 F.Supp. 1221, 1222 (N.D.Ala.1992). As the Court explained in *Randolph,* "[i]n Alabama, the traditional choice of law rule of *lex loci delicti* governs tort causes of action and requires that the substantive law of the place where the tort occurred must be employed, while procedural law of the forum state is to be applied." 792 F.Supp. at 1222. Under *lex loci delicti,* a tort is deemed to have occurred where the alleged harm was suffered. *See Norris v. Taylor,* 460 So.2d 151, 152 (Ala.1984). In this case, any harm suffered by Verilink would have occurred in Alabama, where Verilink had its primary assets and headquarters at the relevant times. (*See* Engagement Agreement between Verilink and Raymond James at 1.) Thus, Alabama law—both substantive and procedural—applies to the Trustee's tort claims.

■ All claims against Raymond James arise from actions leading up to Verilink's acquisition of Larscom and allege damages of "approximately $25 to $30 million dimunition [*sic*] in Verilink's fair value resulting from the Larscom acquisition including, but not limited to, the negative operating cash flow, assumption of liabilities and out-of-pocket acquisition costs." (Corrected Complaint, ¶¶ 176, 181, 197, 203.) Thus the Trustee's claims against Raymond James accrued no later than July 28, 2004, the date Verilink completed its acquisition of Larscom. (*Id.* at ¶ 146.)

■ Under Alabama law, "[a]ll actions for any injury to the person or rights of another not arising from contract and not specifically enumerated in this section must be brought within two years." Ala. Code § 6–2–38(*l*). Section 6–2–38(*l*) applies to all the tort claims against Raymond James, except for Count X for

Fraudulent Inducement. Count X is controlled by Ala.Code § 6–2–3, which provides: "In actions seeking relief on the ground of fraud where the statute has created a bar, the claim must not be considered as having accrued until the discovery by the aggrieved party of the fact constituting the fraud, after which he must have two years within which to prosecute his action." Based on the Trustee's own allegations, it is clear that Verilink learned of the grounds for its alleged fraud claim no later than two months after the acquisition of Larscom, when Pricewaterhouse-Coopers performed the discounted cash flow analysis (DCF) the Trustee claims Raymond James should have done. (Corrected Complaint, ¶¶ 147–51.) [6]

■ Although the Bankruptcy Code, 11 U.S.C. § 108(a), permits a claim to be brought within two years after the filing of a Chapter 11 petition if the limitations period has not already expired, the Corrected Complaint was not filed until October 30, 2008, which was:

- more than four years and three months after the closing of the Larscom acquisition on July 28, 2004 (Corrected Complaint, ¶ 146); and

- more than two years and six months after Verilink filed its Chapter 11 petition in this Court (Corrected Complaint, ¶ 1).[7]

In other words, apart from Verilink's bankruptcy filing, the Trustee's tort claims against Raymond James would have become time-barred no later than July 28, 2006 and no later than September 28, 2006 as to the fraudulent inducement claim. Verilink filed its Chapter 11 petition on April 9, 2006, i.e., before these limitations periods would otherwise have expired. Under 11 U.S.C. § 108(a), the Trustee thus had two years or until April 9, 2008 to file its claims against Raymond James. The Trustee clearly was well aware of the end of the limitations period, given that he filed his initial Complaint on April 8, 2008. But that Complaint only asserted claims against certain former senior officers of Verilink, i.e., Defendants Belden, Taylor and Anderson. The original Complaint did not name Raymond James as a Defendant. Accordingly, none of the claims against Raymond James relates back to the date of filing of the original Complaint. *See* Fed.R.Civ.P. 15(c); Fed. R. Bankr.P. 7015.

■ The Trustee relies upon the doctrine of fraudulent concealment to toll the statutes of limitations. In support of this position, the Trustee argues that he could not have been on inquiry notice of the claims against Raymond James until he received certain specified documents that were supposedly concealed by Powell Goldstein until July 2008.[8] But the allega-

---

**6.** Actually, since the knowledge of the officers directors was imputed to Verilink, and they are alleged to have conspired with and/or directed Raymond James, Verilink had immediate notice of any alleged claims when Raymond James performed its services.

**7.** Plaintiff filed an Amended Complaint on September 29, 2008, but never served Raymond James with that pleading. Even assuming that September 29, 2008 were the relevant date, however, all of the tort claims against Raymond James would still be time-barred.

**8.** This alleged fraudulent concealment, which the Trustee now purports to seize upon, was never even mentioned in the Corrected Complaint filed against Powell Goldstein and Raymond James on October 30, 2008 even though he claimed to discover it three months earlier. The Trustee only seeks to add the allegations now under a proposed Second Amended Complaint, filed on February 12, 2009, in response to Powell Goldstein's motion to dismiss. One is left to speculate why the Trustee elected not to include this claim in his earlier complaint, which was comprehensive to say the least.

tions of concealment are **all** directed at Powell Goldstein; **none** is directed at Raymond James. Nor has the Trustee alleged that Powell Goldstein supposedly held back the documents at the direction of or in concert with Raymond James or anyone else. In fact, the Trustee admits that "[e]ven if Raymond James had not fraudulently concealed its misconduct in the Larscom transition, Powell Goldstein did...." (Pl. Br. at 21–22.) There is no authority cited by the Trustee in his brief to support the proposition that alleged fraudulent concealment by one party tolls the statute as to others.

■ At oral argument, the Trustee argued for the first time that because Raymond James and Powell Goldstein were alleged co-conspirators, the supposed fraudulent concealment by Powell Goldstein tolled the statute against Raymond James. As an initial matter, under the allegations of the Corrected Complaint, the purported conspiracy accomplished its goal and ended when the Larscom acquisition closed on July 28, 2004 and Raymond James' potential liability could not be affected by anything Powell Goldstein did or did not do thereafter. *See United States v. Hernandez,* 141 F.3d 1042, 1053 (11th Cir.1998) (quoting *United States v. Starrett,* 55 F.3d 1525, 1550 (11th Cir.1995), for the proposition that a " 'conspiracy may be deemed to continue as long as its purposes have neither been abandoned nor accomplished' "); (*see also, e.g., United States v. Gonzalez,* 921 F.2d 1530, 1548 (11th Cir. 1991)); *United States v. James,* 494 F.2d 1007, 1026 (D.C.Cir.1974); *United States v. Hickey,* 360 F.2d 127, 140 (7th Cir.1966). In this case, the alleged conspiracy would have ended as a matter of law when it accomplished its purpose on July 28, 2004, with the closing of the Larscom acquisition. *See Hernandez,* 141 F.3d at 1053. In other words, any acts of Powell Gold-

stein or any other alleged co-conspirator cannot be attributed to Raymond James after the ending of the alleged conspiracy.

Furthermore, the two cases cited by the Trustee at oral argument do not support his assertions, *Cabello v. Fernandez–Larios,* 402 F.3d 1148 (11th Cir.2005), and *Riddell v. Riddell Washington Corp.,* 866 F.2d 1480 (D.C.Cir.1989). In *Cabello,* the survivors of a murdered Chilean official (Cabello) filed a lawsuit more than 25 years later against a former Chilean military officer, alleging that he was complicit in the murder, and was otherwise liable for torture, crimes against humanity, and cruel, inhuman or degrading punishment. 402 F.3d at 1151–52. The defendant moved to dismiss the case as time-barred. The district court denied the motion and later entered judgment on a jury verdict in favor of plaintiffs. *Id.*

On appeal, the Eleventh Circuit affirmed, holding that plaintiffs had demonstrated the "extraordinary circumstances" required for equitable tolling under the Alien Tort Claims Act (ATCA) and the Torture Victim Protection Act (TVPA). *Id.* The Eleventh Circuit based its conclusion, in part, on evidence that: (a) the Chilean government, with whom defendant conspired, "concealed both the manner in which Cabello died and his place of burial"; (b) the Chilean government had also "created great confusion by sending three conflicting death certificates to the Cabello family"; and (c) until Chile elected its first post-junta civilian president in 1990, "the Chilean political climate prevented the Cabello family from pursuing any efforts to learn of the incidents surrounding Cabello's murder." *Id.* at 1155. *Cabello* is easily distinguishable from this case because the Trustee's allegations have fallen far short of the "extraordinary circumstances" necessary for equitable tolling. In addition, it seems questionable whether and to

what extent the holdings of *Cabello* apply outside the context of claims under the ATCA and the TVPA, i.e., claims typically involving torture and crimes against humanity, as seemingly indicated by the fact that one judge on the *Cabello* panel concurred in result only. *Id.* at 1161 (Anderson, J., concurring in result).

*Riddell* likewise does not support the Trustee's argument. In that case, the D.C. Circuit acknowledged the general principle that " 'concealment by a third party may not be attributed to the named defendants,' " but recognized an exception where "an act of concealment is attributable to the conspiracy itself." 866 F.2d at 1493 (quoting *Hobson v. Wilson,* 737 F.2d 1, 41 (D.C.Cir.1984)). In this case the general principle applies and the exception has no relevance because the Corrected Complaint does not include any allegations that: (a) the original alleged conspiracy contemplated continuing concealment; (b) the alleged acts of concealment by Powell Goldstein were in furtherance of that conspiracy; or (c) Powell Goldstein was acting as agent for Raymond James when it committed the alleged acts of concealment. *See Riddell,* 866 F.2d at 1493; *see also, e.g., Ex parte Sonnier,* 707 So.2d 635, 637 (Ala.1997) (plaintiffs' medical malpractice claims against hospital were time-barred where plaintiffs failed to produce evidence of an agency relationship between hospital and plaintiffs' physicians, who allegedly made false representations about surgical results); *Ex Parte Prudential Ins. Co. of Am.,* 785 So.2d 348 (Ala.2000) (tolling under Ala.Code § 6–2–3 only proper " 'when there has been a fraudulent concealment *by the party guilty of fraud* ' ") (emphasis in original); 51 Am.Jur.2d *Limitations of Actions* § 188 ("As a general rule, the act of a third person in concealing a cause of action against a defendant does not consti-

tute such a concealment as to prevent the running of the statute of limitations in favor of the defendant.").

The Trustee's tolling theory suffers from other fatal flaws as well. He contends in his brief that he was not on inquiry notice of seven specific enumerated facts giving rise to the claims against Raymond James until receiving the "concealed" documents from Powell Goldstein in July 2008. But the allegations in the Trustee's own Corrected Complaint negate each and every one of these supposed facts.[9]

First, the Trustee asserts that he was not on inquiry notice that Raymond James "knew about Larscom's deteriorating financial condition during the second and third quarters of 2004 in advance of the merger." The Trustee may be correct that Raymond James knew about financial difficulties at Larscom prior to the merger. But the Corrected Complaint itself negates any notion that the Trustee could not have known this until July 2008. Paragraph 101 of the Corrected Complaint states as follows:

> On March 30, 2004, Larscom made public its "going concern" opinion. It filed with the SEC its Form 10–K for year ending December 31, 2003, containing the auditor report by Pricewaterhouse-Coopers on Larscom's financial statements. PricewaterhouseCoopers' report contained the following statement: "[T]he Company has suffered recurring losses from operations and has a net capital deficiency that raise substantial doubt about its ability to continue as a growing concern".

That public SEC filing put the Trustee on inquiry notice from the day he first became involved in the Verilink bankruptcy, that Raymond James and everyone else involved in the Larscom acquisition not

---

9. The Trustee lists the supposed facts in bullet point format on page 24 of his brief.

only knew that Larscom's financial condition was deteriorating before the merger, but also knew that its very existence as a stand-alone company was in serious doubt. Moreover, the day before the going concern opinion was publicly disclosed, Larscom made an SEC filing which revealed very significant negative trends reflecting Larscom's continuing financial deterioration. (Corrected Complaint, ¶ 96.) Based on all of this publicly available information, referenced in his own Corrected Complaint, the Trustee has been on inquiry notice for years that Raymond James (not to mention the investing public at large) was aware of Larscom's worsening financial situation in the months leading up to the merger.

■ Second, the Trustee asserts that he had no prior notice that Raymond James "failed to provide adequate protections in the definitive merger agreement in the form of material adverse conditions to protect Verilink from this precise issue." But the Trustee has had unrestricted access to the corporate files in Verilink's possession, including the Larscom merger agreement, since he became Liquidating Trustee, if not during his tenure as counsel to the Creditors Committee. Thus, he has long had notice of the contents of the merger agreement, including what protections it did and did not give Verilink. More importantly, the Trustee himself has alleged that Raymond James did, in fact, advise Verilink that it should negotiate for material adverse change protection against Larscom's worsening financials. For instance, paragraph 249 of the proposed Second Amended Complaint states:

> [A]n e-mail originating from Defendant Raymond James and copies to Pogo [sic], and Verilink's board meeting minutes from a March 29, 2004, board meeting, all indicating that Raymond James had advised PoGo and Verilink and PoGo [sic] prior to execution of the let-

ter of intent with Larscom that Larscom was likely to burn cash through closing and therefore an appropriate offer strategy for Larscom should **include material adverse condition ("MAC") termination language** providing for downside protection on Larscom's minimum working capital at closing of $6.1 million and a minimum Larscom revenue threshold at closing of $5 million.

(*Id.* (emphasis added).) The Trustee cannot base a cause of action on the failure to give such advice when his own Corrected Complaint alleges that Raymond James actually gave that advice. Similarly, in paragraph 114(b) of the Corrected Complaint, the Trustee alleges that Raymond James did advise Verilink:

> [T]hat Larscom should be required to maintain a *minimum quarterly revenue performance threshold of between $3 million to $4 million*, i.e. for the Larscom's 1st and 2nd fiscal quarters of 2004 immediately prior to the closing and to **set that threshold as a material adverse condition "below which V[erilink] wouldn't want to buy L[arscom] 'no matter what'**, i.e. V[erilink] would seek to walk away irrespective of the purchase price reduction triggered by the working capital adjustment."

(*Id.* (emphasis added).) Again, the Trustee is bound by the facts alleged in his own *Corrected Complaint*, which negate the conclusory assertions in his brief.

Third, in further support of his fraudulent concealment argument, the Trustee contends that he could not have known that the Defendants "hid Larscom's reduced revenue threshold levels in an undisclosed side letter to the definitive merger agreements." But this contention is not applicable to Raymond James for the following reasons. The Trustee never alleges in the Corrected Complaint, or his brief

for that matter, that Raymond James ever could have or did conceal (or even saw) the letter agreement between two other entities, namely Verilink and Larscom. To the contrary, the Trustee alleges that Defendants Belden and Smith, not Raymond James, arranged for the side letter on behalf of Verilink. (Corrected Complaint, ¶ 127.) In fact, the Trustee alleges that Raymond James warned Verilink's Board that Larscom was "likely to burn through cash at closing" and recommended that Verilink should negotiate for material adverse change protection in case Larscom's working capital shrunk below $6.1 million or its quarterly revenue dipped below $5 million. (Second Amended Complaint, ¶ 249.) Nonetheless, Verilink executed the alleged side letter with a lower revenue threshold.

Even more importantly, the Trustee does not assert any cause of action against Raymond James that arises out of the alleged letter agreement. In other words, the existence of the side letter is not evidence that supports or gives rise to any claim against Raymond James. Thus, whether or not the side letter was fraudulently concealed has no bearing on the running of the applicable limitations periods, at least as to Raymond James.

Fourth, the Trustee argues that he had no knowledge that Defendants "knew that Verilink's April 28, 2004 guidance of positive cash flow and earnings from operations was untrue prior to shareholder approval of the merger." It is not clear that Raymond James is even one of the "Defendants" referenced in this assertion. However, it is clear that the Trustee never alleges that Raymond James had such information or covered it up. The Trustee makes that allegation exclusively against Verilink management and Powell Goldstein. (Corrected Complaint, ¶¶ 125–27; Second Amended Complaint, ¶ 249.) More

importantly, this allegation does not support or give rise to any claim asserted against Raymond James. Raymond James has not been sued for misleading Verilink's shareholders.

Fifth, the Trustee claims he was not on inquiry notice that Defendants "had made material misrepresentations and omissions in the Proxy Statement to secure shareholder approval for the merger." Again, there is not a single allegation in the Corrected Complaint that Raymond James prepared the Proxy Statement or misled investors. Those allegations are leveled against other Defendants. (Corrected Complaint, ¶¶ 137–41.) Those allegations do not support any of the claims against Raymond James. Whether or not the Proxy Statement was misleading, or whether the Trustee was on inquiry notice of it during the limitation period, has nothing to do with the claims asserted against Raymond James.

Sixth, the Trustee argues that he was not on inquiry notice that Defendants "did not conduct adequate due diligence on Larscom." However, the evidence the Trustee claims was concealed has nothing to do with due diligence conducted by Raymond James or anyone else. (Second Amended Complaint, ¶ 249.) Thus, the fraudulent concealment doctrine is inapplicable. Moreover, the Trustee has had access to the corporate files in Verilink's possession at least since he became Liquidating Trustee, if not since he began representing the Creditor's Committee in 2006. Accordingly, he has long been on inquiry notice, if not actual notice, about what level of due diligence, if any, was reflected in those files. If due diligence files were either absent or insufficient, then he was on inquiry notice of that fact.

Seventh, and last, the Trustee contends he was not on notice that Defendants "knew that Raymond James' fairness opin-

ion on the value of the Larscom transaction did not have a reasonable basis."[10] The Trustee alleges in the Corrected Complaint that Raymond James must have lacked a reasonable basis because it failed to perform a DCF. (Corrected Complaint, ¶¶ 99–100.) However, the Defendants, the Trustee and the public at large have been on inquiry notice since no later than June 24, 2004, that Raymond James did not perform a DCF as part of its work because on that date, Verilink filed its amended Proxy Statement for the Larscom deal with the SEC. (Corrected Complaint, ¶ 137.) The Proxy Statement separately described each of the valuation methods Raymond James used and ed the Fairness Opinion itself as an annex. It is clear from the face of the publicly-filed Proxy Statement that Raymond James did not use the DCF method and that the Verilink Defendants and, in fact, Verilink's entire Board, including its outside directors, knew that. (Proxy Statement at 50–53.) Thus, the Trustee cannot claim that he was not on inquiry notice of that fact prior to the expiration of the limitations period due to fraudulent concealment.

In short, the statute of limitations is not tolled against Raymond James.

### D. THE FRAUDULENT INDUCEMENT CLAIM IS FATALLY FLAWED.

■ Parsing the hundreds of paragraphs in the Corrected Complaint and the Trustee's brief to ascertain details of the supposedly fraudulent conduct alleged against Raymond James, it comes down to this: the Trustee contends that in addition to the valuation methodologies Raymond James included in its fairness opinion in connection with the Larscom acquisition, it should have also used the DCF method.

Based on this contention, the Trustee implausibly concludes that at the time Raymond James signed the engagement agreement (i.e., the Contract) with Verilink, Raymond James must have intended not to perform its contractual duties in an honest and competent fashion and, therefore, deceived Verilink. In the Trustee's words:

> Raymond James's failure to perform and incorporate a discounted cash flow analysis into its strategic advice, valuation and (eventual) fairness opinion was, at a minimum, a knowing and willful dereliction of its duties to Verilink. Complaint, ¶ 100. Moreover, it provides evidence that Raymond James had no intention of rendering honest services to Verilink in connection with its investment banking and fairness opinion engagement, which it contracted for just four days prior, and that Raymond James had breached its duties to Verilink, and fraudulently induced Verilink, in connection with the negotiation of the terms of its own engagement agreement with the Company. *Id.*

(Pl. Br. at 7 n. 1.) What amounts to no more than criticism of valuation methodology falls far short of actionable allegations that could legally support a fraud judgment even if true. That the Trustee argues otherwise, without citing any supporting legal authority, is telling.

■ This is not all that demonstrates that the Trustee's fraud claim is flawed. The publicly-filed Proxy Statement referenced in the Corrected Complaint (to which the Fairness Opinion for the Larscom acquisition was attached) reflected on its face that Raymond James used other

---

10. This point does not even appear to have anything to do with the tolling of the statute on claims against Raymond James as opposed to the other Defendants.

valuation methods, but did **not** use DCF.[11] But Larscom's financial adviser, Standard & Poor's Corporate Value Consulting, did perform a DCF analysis and the Proxy Statement contained a detailed discussion of the conclusion of Standard & Poor's, including values for each of the companies based on the DCF method. (Proxy Statement (Ex. A to Albert Decl. at 57 & C2).) Verilink apparently did not require a DCF from Raymond James, did not specify the need for one in the Contract, and knew (along with anyone who read the Proxy Statement) that it did not get one from Raymond James, but had readily available to it the DCF valuation performed by Standard & Poor's.[12] The Trustee's fraud claim collapses in the face of these incontrovertible facts that he himself has pled.

Neither is any reliance alleged on the part of Verilink, i.e., the Trustee does not allege that Raymond James would not have been retained had Verilink known that Raymond James would not use the DCF method. Neither does the Trustee allege causation, i.e., that Verilink would not have acquired Larscom and suffered financial losses if Raymond James had performed a DCF.[13] To the contrary, the Trustee alleges that the "Verilink Defendants were going to close on the Larscom transaction at any cost under their timeframe door step strategy." (Pl. Br. at 4; *see also, e.g.,* Corrected Complaint at ¶ 92) ("The Verilink Defendants had a duty not to let Verilink enter into the Raymond James engagement agreement under the terms therein in light of their own knowledge of their intent—as evidenced from the allegations below—to close on the Larscom transaction no matter what.")

In sum, the facts pled in the Corrected Complaint and the operative documents it references contradict any intent to deceive on the part of Raymond James. The Trustee's allegations and basic theory of the case as to Raymond James are simply not plausible and all of his causes of action against Raymond James should be dismissed on that basis alone. *See Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007) (in order to survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), the plaintiff must allege "enough facts to state a claim to relief that is **plausible on its face**") (emphasis added); *St. Germain v. Howard,* 556 F.3d 261, 263 n. 2 (5th Cir.2009) ("*Twombly* jettisoned the minimum notice pleading requirement of *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), and instead required that a complaint allege enough facts to state a claim that is plausible on its face.").

### E. RAYMOND JAMES WAS NOT A FIDUCIARY

■ In Count XI, the Trustee asserts a claim for breach of fiduciary duty against

---

**11.** The Trustee makes frequent and express reference to the Fairness Opinion and the Proxy Statement in his Corrected Complaint. (*See, e.g., id.* at ¶¶ 90, 93, 95, 100, 111, 117, 118, 119, 129–35, 140, 142–45.) In ruling on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), courts can and should consider "documents incorporated into the complaint by reference." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 127 S.Ct. 2499, 2509, 168 L.Ed.2d 179 (2007).

**12.** Note that Verilink's full Board of Directors, not just the Verilink Defendants, approved the Contract for Raymond James' engagement and signed off on the Proxy Statement. (*E.g.,* Corrected Complaint at ¶¶ 91–92, 135, 137, 139, 140.)

**13.** It is recognized that DCF analyses, without appropriate adjustments and projections, are not well-suited for entities like Larscom that are currently losing money. Aswath Damodaran, *Damodaran on Valuation: Security Analysis for Investment and Corporate Finance* 13 (1994).

Raymond James. The Contract expressly disclaims the existence of any such duties. In particular, Section 5(c) provides:

> [Verilink] is a sophisticated business enterprise with competent internal financial advisors and legal counsel, and [Verilink] has retained Raymond James for the limited purposes set forth in this Agreement. The parties acknowledge and agree (i) that Raymond James has been retained solely for the purposes set forth herein and (ii) that [Verilink's] engagement of Raymond James is as an independent contractor and that their respective rights and obligations as set forth herein are contractual in nature. Accordingly, [Verilink] disclaims any intention to impose fiduciary or agency obligations on Raymond James by virtue of the engagement contemplated by this Agreement, and Raymond James shall not be deemed to have any fiduciary or agency duties or obligations to any Targets [e.g., Larscom], other business entities or [Verilink], or their respective officers, directors, shareholders, affiliates or creditors, as a result of this Agreement or the services to be provided pursuant hereto.

The Trustee attempts to circumvent the disclaimer by asserting a fraudulent inducement claim. (*See* Corrected Complaint, ¶¶ 171, 173, 178.) But that claim itself is subject to dismissal for the reasons previously stated. Even assuming for purposes of argument that the applicable language in the Contract were not dispositive, it is an accurate representation of fact attested to by both Verilink and Raymond James, a representation that neither party expected the relationship to give rise to the special relationship of trust that characterizes a fiduciary relationship. Instead, Verilink could reasonably expect only that Raymond James would provide those services, and only those services, set forth in the Contract.

Even apart from the contrary language in the Contract, Raymond James did not owe Verilink any such duties as a matter of law. The Alabama Supreme Court defined a fiduciary or confidential relationship as one in which:

> [O]ne person occupies toward another such a position of adviser or counselor as reasonably to inspire confidence that he will act in good faith for the other's interests, or when one person has gained the confidence of another and purports to act or advise with the other's interest in mind; where trust and confidence are reposed by one person in another who, as a result, gains an influence or superiority over the other; and it appears when the circumstances make it certain the parties do not deal on equal terms, but, on the one side, there is an overmastering influence, or, on the other, weakness, dependence, or trust, justifiably reposed; in both an unfair advantage is possible. It arises in cases in which confidence is reposed and accepted, or influence acquired, and in all the variety of relations in which dominion may be exercised by one person over another.

*Univ. Fed. Credit Union v. Grayson,* 878 So.2d 280, 291 (Ala.2003). Under this definition, the allegations of the Corrected Complaint establish that Raymond James did not stand in a fiduciary relationship to Verilink under the facts the Trustee has pled. Other cases confirm that Raymond James did not owe Verilink any fiduciary duties as a matter of law. *See, e.g., Joyce v. Morgan Stanley & Co., Inc.,* 538 F.3d 797, 800–03 (7th Cir.2008); *KSC Recovery, Inc. v. First Boston Corp. (In re Kaiser Merger Litigation),* 168 B.R. 991, 998 (D.Colo.1994).

The Trustee argues (i) his fraudulent inducement claim (Count X) precludes

Raymond James from relying on the disclaimer of a fiduciary relationship in the Contract; and (ii) an investment banker owes its corporate client fiduciary duties as a matter of law (or at least that issue presents a question of fact). Neither argument has merit.

As to the Trustee's first argument, the fraudulent inducement claim is subject to dismissal for the multiple reasons previously stated. Thus, that claim presents no obstacle to Raymond James' reliance on the disclaimer language in the Contract. Even assuming otherwise, however, the contractual disclaimers would still preclude the Trustee's claim for breach of fiduciary duties. *See, e.g., Mac–Gray Serv., Inc. v. DeGeorge,* 913 So.2d 630, 633–34 (Fla.Dist. Ct.App.2005). In *Mac–Gray,* the buyers of laundry equipment sued the seller for fraudulent inducement and breach of fiduciary duty, alleging that the seller had made material misrepresentations about the potential profitability of a laundromat the buyers intended to open. The applicable contract contained disclaimers, which among other things, negated any representations regarding profitability and reliance on the seller's expertise. Following a jury verdict for buyers, the seller appealed and the appellate court reversed, holding that the trial court erred in refusing to grant seller a directed verdict. *Id.* at 631–32.

The buyers in *Mac–Gray* made the same argument as does the Trustee here, i.e., that a claim of fraudulent inducement renders an entire contract unenforceable. *Id.* at 634. In fact, the buyers even purported to rely on one of the principal cases the Trustee relies on here, *D & M Jupiter, Inc. v. Friedopfer,* 853 So.2d 485, 487–88 (Fla.Dist.Ct.App.2003). (Pl. Br. at 33.) In rejecting these arguments, the court started from the basic proposition that no fiduciary duty can arise from an "ordinary commercial transaction," even when one party possesses greater expertise than the other as to a particular matter. 913 So.2d at 634. Thus, the court stated that it would have rejected the buyers' fiduciary duty claim even without a specific contractual disclaimer. 913 So.2d at 633. But the court went on to find that "the contract itself negates the existence of a fiduciary duty as the purchaser acknowledges that he is *not* relying on any expertise of the seller in entering into the contract to purchase the equipment or to continue the business opportunity." *Id.* In purported reliance on the *D & M Jupiter* case, the buyers argued that their claim for fraudulent inducement vitiated the entire contract, including the disclaimers. *Id.* at 634. The court rejected this argument, noting, among other things, that the disclaimer in *D & M Jupiter* did not expressly encompass the alleged misrepresentations, while the buyers' fiduciary duty claim in *Mac–Gray* was expressly addressed and negated by the contract. The same is true here—the Contract contains a detailed disclaimer in Section 5(c) that is considerably stronger and more comprehensive than the comparable disclaimer in *Mac–Gray.*

The Trustee cites three primary cases in support of his argument that Raymond James stood in a fiduciary relationship to Verilink, *Swann v. Regions Bank,* —— So.2d ——, 2008 WL 4182699 (Ala.Civ. App. Sept.6, 2008), *American Tissue, Inc. v. Donaldson, Lufkin & Jenrette Securities Corp.,* 351 F.Supp.2d 79, 102–04 (S.D.N.Y.2004); *Official Committee of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Securities Corp.,* 2002 WL 362794, at *9 (S.D.N.Y.2002) (hereinafter "*SmarTalk*"). None of these cases supports the Trustee's fiduciary duty claim.[14]

---

14. With the lone exception of *Joyce,* the ·Trustee fails to discuss or distinguish the cases

As to *Swann,* the court affirmed the trial court's grant of summary judgment against two home purchasers who had sued a bank and its loan officer who approved a construction loan to a builder that was secured by the purchasers' property. —— So.2d ——, ——, 2008 WL 4182699, at *1 to *2. Among other things, the purchasers alleged that the bank had breached its fiduciary duty by referring them to the builder without disclosing that the builder was not properly licensed. *Id.* The builder never completed the house and declared bankruptcy after it was sued by the purchasers. *Id.* The court declined to find any potential liability for the bank, as a matter of law, because of the lack of a "confidential relationship" under the following definition:

> " '[[a] relationship in which] one person occupies toward another such a position of adviser or counselor as reasonably to inspire confidence that he will act in good faith for the other's interests, or when one person has gained the confidence of another and purports to act or advise with the other's interest in mind; where trust and confidence are reposed by one person in another who, as a result, gains an influence or superiority over the other; and it appears when the circumstances make it certain the parties do not deal on equal terms, but, on the one side, there is an overmastering influence, or, on the other, weakness, dependence, or trust, justifiably reposed;

in both an unfair advantage is possible. It arises in cases in which confidence is reposed and accepted, or influence acquired, and in all the variety of relations in which dominion may be exercised by one person over another.' "

*Id.* at ——, 2008 WL 4182699, *11 (quoting *Holdbrooks v. Central Bank of Alabama, N.A.,* 435 So.2d 1250, 1252 (Ala.1983) (quoting 15A C.J.S. *Confidential* (1967))). Under this standard, Raymond James did not have a confidential or fiduciary relationship with Verilink under the facts as alleged by the Trustee.

 Likewise the two New York cases cited by the Trustee, *American Tissue,* 351 F.Supp.2d 79, and *SmarTalk,* 2002 WL 362794, do not support his argument. Neither case stands for the proposition that investment banks always have fiduciary obligations to their customers. To the contrary, both cases generally acknowledge that no such duty is owed, but recognize an exception based on allegations that the investment bank penetrated into and dominated their clients' affairs and management or otherwise obtained a superior advantage. In neither case did the investment bank's engagement letter contain express language disclaiming a fiduciary relationship. In fact, the Trustee has failed to cite any case in which an investment bank was held to be a fiduciary in the face of express contractual disclaimers like

cited by Raymond James on this point. The Trustee does purport to distinguish *Joyce* on the basis that the investment bank there was being sued by an advisory customer's shareholders, rather than the company itself; and plaintiffs did not assert a claim of fraudulent inducement. (Pl. Br. at 38–39.) Neither point has merit. Nowhere in the *Joyce* opinion is there any suggestion that the result would have been different as to a fiduciary duty claim if the investment bank had been sued by its customer, as opposed to the cus-

tomer's shareholders. In fact, *Joyce* repeatedly rejects plaintiffs' arguments as barred by the language of the bank's engagement letter. 538 F.3d at 800–03. In a passage ignored by the Trustee, *Joyce* holds that "investment banks' responsibilities are set by contract; the fact that someone wishes that a different contract had been written is not a basis for liability." *Id.* at 802 (citing *HA2003 Liquidating Trust v. Credit Suisse Securities (USA) LLC,* 517 F.3d 454 (7th Cir.2008)).

those in the Contract.[15]

In fact, these two cases were distinguished on this exact ground in the *e2 Creditors Trust v. Stephens, Inc. (In re e2 Communications, Inc.)*, 354 B.R. 368, 392–94 (Bankr.N.D.Tex.2006). In e2, the court observed that a fiduciary duty might typically arise from the traditional relationship between a retail customer and his or her stockbroker, but distinguished this relationship from that of an investment bank/financial adviser and its corporate client. *Id.* at 392. The plaintiffs in *e2*, a trustee and litigation trusts created in bankruptcy, argued that *American Tissue* and *SmarTalk* supported their claim for breach of fiduciary duty. The court rejected this argument because

> [t]he facts here are different from the facts present in the New York financial advisor cases. The extent of [investment bank's] involvement in the Merger was significantly less than the involvement of the investment banking firms in the New York cases. In short, [the investment bank] did not penetrate [debtor's] finances and management.

*Id.* at 393.

The facts here are analogous to *e2*, rather than *American Tissue* and *SmarTalk*. In this case, the Trustee has not alleged and could not allege that Raymond James penetrated, dominated or somehow obtained a superior advantage over Verilink and its management. Rather, the opposite is true—the Trustee has essentially alleged that the Verilink management (Defendants Belden, Taylor and Smith) hired

Raymond James to rubber-stamp their pre-existing decision to proceed with the Larscom transaction "no matter what." (*E.g.*, Corrected Complaint, §§ 84, 92–94, 96, 98–100, 104–06, 109–111, 113–23.) Accordingly, the Trustee's claim for breach of fiduciary duty must be dismissed as a matter of law.

## F. THE IMPLIED CONTRACTUAL DUTY CLAIM FAILS

In Count IX, the Trustee asserts a claim for Breach of Implied Contractual Duty of Good Faith and Fair Dealing. (Corrected Complaint, ¶¶ 163–67.) This claim sounds in contract and depends entirely on the Contract, as made clear by the Trustee's allegations:

> Raymond James owed an implied contractual duty of good faith and fair dealing in connection with its inducement to Verilink to enter into its engagement agreement with Verilink on the Larscom transaction and with respect to its performance under the engagement agreement.

(*Id.* at ¶ 164.) The Contract contains a choice of law clause that provides: "This Agreement shall be governed by and construed in accordance with the laws of the State of Florida." Thus, Florida law governs any claims against Raymond James that sound in contract. *See, e.g., Cherry, Bekaert & Holland v. Brown*, 582 So.2d 502, 506 (Ala.1991).

Florida law recognizes the implied covenant of good faith and fair deal-

---

**15.** The Trustee makes much of his claim of fraudulent inducement, but absent a claim that the alleged inducement went directly to these contractual provisions, i.e., Raymond James told Verilink that it was going to be a fiduciary and then presented the company with an agreement that stated the opposite, the disclaimers would remain valid, even were the claim of fraudulent inducement oth-

erwise to succeed. *See, e.g., Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 402–04, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967) (absent claim of fraud going directly to the arbitration provision, party was required to arbitrate claim of fraudulent inducement under principle of "severability"); *Mac–Gray*, 913 So.2d at 633–34.

ing in every contract. *See Insurance Concepts and Design, Inc. v. Healthplan Services, Inc.*, 785 So.2d 1232, 1234 (Fla. Dist.Ct.App.2001); *see also County of Brevard v. Miorelli Engineering, Inc.*, 703 So.2d 1049, 1050 (Fla.1997). As the court in *Insurance Concepts* explained, this cause of action has two important restrictions: "First, the implied covenant of good faith and fair dealing cannot be invoked to override the express terms of the agreement between the parties.... Second, a claim for breach of implied covenant of good faith and fair dealing cannot be maintained under Florida law absent an allegation that an express term of the contract has been breached." *Id.* at 1234 (citing multiple cases). In other words, Florida law does not permit a party like the Trustee in this case to avoid contractual restrictions merely by alleging some amorphous lack of good faith. *See, e.g., Johnson Enter. of Jacksonville, Inc. v. FPL Group, Inc.*, 162 F.3d 1290, 1314 (11th Cir.1998) (holding that "[t]he good faith requirement does not exist 'in the air'"; "[r]ather, it attaches only to the performance of a specific contractual obligation"); *Hosp. Corp. of Am. v. Fla. Med. Ctr., Inc.*, 710 So.2d 573, 575 (Fla.Dist.Ct. App.1998).[16]

In this case, Count IX fails on both of these grounds. Not once in his Corrected Complaint does the Trustee identify a specific term of the Contract that Raymond James allegedly breached. The Trustee tries to gloss over this deficiency by referring to, but not attaching the Contract to his Complaint. The Trustee attempts to bootstrap his breach of implied contractual duty claim (Count IX) into his fraudulent inducement claim (Count X). (Corrected

Complaint, ¶ 164.) This is insufficient to satisfy the requirements for pleading this claim under Florida law. *See Johnson Enter.*, 162 F.3d at 1314; *Ins. Concepts*, 785 So.2d at 1234.

Count IX is subject to dismissal for the additional reason that the Trustee seeks to impose on Raymond James duties that are contrary to express provisions of the Contract. Among other things, the Trustee seeks to fault Raymond James for relying on projections prepared by Larscom, supposedly without independently verifying these projections. (Corrected Complaint, ¶ 96; *see also, e.g., id.* at ¶¶ 98, 111, 116.) But the Contract contains an express provision that states:

> In conjunction with the engagement outlined herein, [Verilink] agrees to provide the necessary assistance and information required at all steps and to have management reasonably available as may be required by Raymond James. In connection with Raymond James' services, [Verilink] will furnish to Raymond James such information and data relating to [Verilink] as Raymond James may reasonably request. [Verilink] recognizes and confirms that Raymond James, in the performance of its services hereunder: (i) may rely upon such information received from [Verilink] or its advisors, without independent verification by Raymond James; and (ii) does not assume responsibility for the accuracy or completeness of such information received from [Verilink] or its advisors whether or not Raymond James makes an independent verification thereof.

*Id.*, Section 5(g). *See also* Fairness Opinion at B–1 disclosing Raymond James' reli-

---

**16.** Alabama law is identical. *See, e.g., Lake Martin/Ala. Power Licensee Assoc., Inc. v. Ala. Power Co.*, 601 So.2d 942, 945 (Ala.1992) (claim for breach of implied covenant is "not actionable absent an identifiable breach in the performance of specific terms of the contract"; "there is no contractual cause of action for breach of an implied duty of good faith that nebulously hovers over the parties, free from the specific terms of the contract").

ance upon the projections provided by the transaction participants. Courts have regularly upheld the validity of such contractual provisions. *See, e.g., HA2003 Liquidating Trust,* 517 F.3d at 456 (affirming decision for investment bank; banker could not be liable for "do[ing] what the contract required it to do: use the figures and projections furnished by its client").

 The Trustee argues that he has elected to avoid the Contract because it was fraudulently induced and thus Raymond James cannot rely on any contractual disclaimers or limitation of liabilities; and the Corrected Complaint outlines many ways in which Raymond James failed to perform its contractual duties. (Pl. Br. at 25–28.) The Trustee's argument lacks merit. The Trustee cannot simultaneously seek to avoid the Contract for alleged fraudulent inducement (Count X) and at the same time sue for damages for breach of the Contract, via his claim for breach of the implied contractual duties of good faith and fair dealing (Count IX). The law bars the Trustee from simultaneously pursuing these mutually exclusive remedies. As established by one of the cases on which the Trustee purports to rely (Pl. Br. at 27–28, citing *Mazzoni Farms, Inc. v. E.I. DuPont De Nemours and Co.,* 761 So.2d 306 (Fla.2000)), faced with the Contract that he alleges was induced by fraud, the Trustee could have elected (i) to avoid the contract and seek damages for fraud, or (ii) to affirm the Contract and seek damages for its breach. *Id.* at 313 ("Consistent with the majority view, Florida law provides for an election of remedies in fraudulent inducement cases: rescission, whereby the party repudiates the transaction, or damages, where-

by the party ratifies the contract."); *see also Fla. Evergreen Foliage v. E.I. Dupont De Nemours and Co.,* 336 F.Supp.2d 1239, 1302 (S.D.Fla.2004) (same).

In the Corrected Complaint and his brief, the Trustee has made it clear that he "has elected to avoid the [Contract] on the ground that it was fraudulently induced." (E.g., Pl. Br. at 27; *see also id.* "Raymond James further argues that Count IX is subject to dismissal on the ground that the Trustee precluded from asserting extra-contractual liability by virtue of the express provisions of the [Contract].... But this is precisely the reason why the Trustee has elected to avoid the [Contract] on the basis that Verilink's entry into it was fraudulently induced." [17]) Having elected to avoid the Contract, the Trustee cannot then turn around and seek damages for its alleged breach. *See, e.g., Jackson v. BellSouth Telecomm.,* 372 F.3d 1250, 1279 (11th Cir.2004) ("Florida law requires plaintiffs to make an election of remedies, choosing between rescission, in which a voidable contract is repudiated, and damages, in which the contract is affirmed. 'The two remedies .... [are] mutually exclusive. A claim for rescission is predicated on disavowal of the contract. A claim for damages is based upon its affirmance.' "); *Dist. Bd. of Trustees v. Morgan,* 890 So.2d 1155, 1160 (Fla.Dist.Ct.App. 2004) ("[W]e note that [plaintiff] sought and received damages for fraudulent inducement. The fraud alleged was the misrepresentation of the [defendants] about their business relationship. Consistent with the proposition that fraudulent inducement renders a contract voidable, not void, Florida law provides an election of

---

17. Similarly, the Trustee later argues that his negligence claim is "viable because [he] seeks to avoid the [Contract]." (Pl. Br. at 37.) The Trustee cannot have it both ways—having elected to avoid the Contract based on alleged fraudulent inducement, he cannot simultaneously seek damages based on contractual duties that arise solely from the avoided Contract.

remedies where fraudulent inducement is claimed. The wronged party may either repudiate the contract and seek rescission, or ratify the contract and seek damages.")

In a recent and well-reasoned decision applying Florida law, plaintiff sued defendant for alleged violations of an asset purchase agreement ("APA") involving the transfer of cable television contracts and systems. *See Galaxy Cable, Inc. v. Cablevision of Marion County, LLC,* 2006 WL 2265419, at *1 (M.D.Fla. Aug. 8, 2006). In particular, plaintiff alleged that defendant had breached the APA by refusing to take steps to complete the assignment of one of the cable contracts (the "Bahia Oaks Contract"). Defendant then filed a counterclaim against plaintiff alleging claims in tort, "most of which allegedly incurred during the negotiation of the APA at issue," and seeking damages available only under the APA. *Id.* The Court granted plaintiff's motion to dismiss the counterclaim, finding that "in order to proceed with its claim for fraudulent inducement, [defendant] must either repudiate the APA and seek rescission of the agreement *in toto,* or affirm the APA and seek damages." *Id.* Defendant then filed a two-count amended counterclaim: Count I seeking rescission of the portion of the APA that applied to the Bahia Oaks Contract, but not rescission of the entire APA; and Count II seeking damages for breach of the APA. *Id.*

In reasoning equally applicable to the Trustee's claims here, the Court granted plaintiff's motion to dismiss the amended counterclaim under Rule 12(b)(6), rejecting, as a matter of law, defendant's contention that the APA was divisible and further holding:

> Because the APA is indivisible, Florida law—as well as prevailing and generally recognized contract law—does not permit a party to a contract to rescind only

the portion of the contract that the party views as disadvantageous while at the same time affirm the other portion of the contract that the party perceives as beneficial. As previously discussed in the Court's order granting [plaintiff's] motion to dismiss the prior counterclaim, [defendant] must either repudiate the asset purchase agreement and seek rescission of the agreement or affirm the asset purchase agreement and seek damages. It cannot have it both ways.

*Id.* at *3. Just as in *Galaxy Cable,* the Contract at issue here is indivisible—the Trustee has not and could not argue to the contrary. The Trustee is thus bound by his election to avoid the Contract and is precluded from seeking damages under any contractual theory, including his claim for breach of the implied contractual duty of good faith and fair dealing alleged in Count IX.

## G. THE NEGLIGENCE CLAIM FAILS

 The Trustee's negligence claim is time barred, is precluded by the doctrine of *in pari delicto,* and is defective due to the impossibility of establishing proximate cause, all as discussed above. Moreover, Raymond James owed Verilink no extra-contractual tort duties as a matter of law. *See HA2003 Liquidating Trust,* 517 F.3d at 458–59; *see also Joyce,* 538 F.3d at 802.

In *HA2003 Liquidating Trust,* a liquidating trust created in the bankruptcy case of an acquiring corporation sued the investment banker, Credit Suisse First Boston ("CSFB"), the debtor had retained in connection with its acquisition of an Internet start-up company. 517 F.3d at 455–56. In affirming a decision for CSFB, the Seventh Circuit pointedly noted:

> In the end, the Trust wants us to throw out the detailed contract that [debtor] and CSFB had negotiated and to make

up a set of duties as if this were tort litigation. That would be a mistake, one very costly for investors at other firms who would have to pay a risk premium to investment bankers in the future. Intelligent adults can set their own standards of performance, and courts must enforce the deal they have struck. *See Wallace v. 600 Partners Co.*, 86 N.Y.2d 543, 634 N.Y.S.2d 669, 658 N.E.2d 715 (N.Y.1995). The engagement contract says that CSFB has no duty to double-check the predictions about [the acquired company's] future revenues and no duty to update its opinion. CSFB did what it was hired to do. The Trust's belief that CSFB should have been hired to do something different is not a basis of liability.

517 F.3d at 458–59; *Joyce*, 538 F.3d at 802 (upholding disclaimers in investment bank's engagement letter and fairness opinion). Just as in *HA2003 Liquidating Trust* and *Joyce*, there is no basis here to allow the Trustee to rewrite the Contract and impose duties on Raymond James after the fact, in the guise of a negligence claim or otherwise.

## H. THE CONSPIRACY CLAIM IS WITHOUT MERIT

■ In Count XV, the Trustee alleges a claim for civil conspiracy. In Alabama, a civil conspiracy claim requires the plaintiff to establish that two or more individuals combined to ·accomplish a lawful end by unlawful means. *See Nimbus Technologies, Inc. v. SunnData Products, Inc.*, No. CV–04–CO–00312–W, 2005 WL 6133373, at *18–*19 (N.D.Ala. Dec. 7, 2005), *clarified on other grounds*, 2005 WL 6133372 (N.D.Ala. Dec.21, 2005), *aff'd*, 484 F.3d 1305 (11th Cir.2007). In order to establish a claim for civil conspiracy, a plaintiff must also allege a valid underlying claim for "some other 'independently recognized tort.'" 2005 WL 6133373, at *18

(quoting *Funliner of Ala., L.L.C. v. Pickard*, 873 So.2d 198, 211 (Ala.2003)). Civil conspiracy is a derivative tort—it cannot stand by itself. If there is no liability for the independent underlying tort, then there can be no liability for civil conspiracy. *See Triple J Cattle, Inc. v. Chambers*, 621 So.2d 1221, 1225 (Ala.1993) (holding that "[a] conspiracy claim must fail if the underlying act itself would not support an action"); *see also, e.g., Callens v. Jefferson County Nursing Home*, 769 So.2d 273, 280 (Ala.2000). For the reasons stated above, all of the Trustee's independent tort claims are hereby dismissed. Accordingly, Count XV for conspiracy is dismissed as well.

## I. ALABAMA LAW DOES NOT RECOGNIZE A CAUSE OF ACTION FOR AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY.

■ In Count XVI, the Trustee asserts a cause of action for aiding and abetting breaches of fiduciary duties allegedly committed by the Verilink Defendants (Corrected Complaint, ¶ 12) against Raymond James and Powell Goldstein. In *Continental Casualty Co. v. Compass Bank*, No. 04–0766–KDC, 2006 WL 566900, **9–12, 2006 U.S. Dist. LEXIS 12999, at *28 to *35 (S.D.Ala. Mar. 6, 2006), the Court undertook an extensive analysis of the relevant case law and concluded that no "substantial support [existed] for the plaintiff's argument that the common law tort of aiding and abetting a fiduciary duty exists under Alabama law." *Id.*, 2006 WL 566900, *11, 2006 U.S. Dist. LEXIS 12999 at *30 ("Unlike other states, it does not appear that Alabama recognizes the claim of aiding and abetting common law torts."). Accordingly, the Court granted defendant's motion for summary judgment, which it "treat[ed] as a motion to dismiss for failure to state a claim." *Id.*, 2006 WL

566900, *12, 2006 U.S. Dist. LEXIS 12999, *35 ("Alabama law does not recognize the common law cause of action of aiding and abetting breach of fiduciary duty").

 The Trustee argues that Delaware law, not Alabama law, controls under the "internal affairs" doctrine, based on Verilink's incorporation in Delaware. The Trustee is wrong. The "internal affairs" doctrine only applies to claims brought by and against corporate insiders like Defendants Belden, Taylor, Anderson, Smith and Westbrook. In fact, the Alabama cases he cites, *Massey v. Disc Manufacturing, Inc.*, 601 So.2d 449, 455–56 (Ala. 1992) and *Tucker v. Scrushy*, 2006 WL 37028 (Ala.Cir. Jan.3, 2006), deal with insiders and support this proposition.

The Trustee cites some non-binding decisions from other jurisdictions that do apply the law of the state of incorporation to corporate outsiders alleged to have aided and abetted breaches of fiduciary duty committed by corporate insiders. But these cases are contrary to the better-reasoned weight of authority that rejects application of "internal affairs" doctrine to claims against corporate outsiders like Raymond James and instead applies standard conflict of law rules. *See, e.g., LaSala v. UBS, A.G.*, 510 F.Supp.2d 213, 230–231 & n. 9 (S.D.N.Y.2007); *Buchwald v. Renco Group (In re Magnesium Corp. of Am.)*, 399 B.R. 722, 741–42 (Bankr. S.D.N.Y.2009); *Silverman v. H.I.L. Assoc. Ltd. (In re Allou Distrib.)*, 387 B.R. 365, 394–96 (Bankr.E.D.N.Y.2008); *Official Comm. of Unsecured Creditors of Norstan Apparel Shops, Inc. v. Norman Lattman (In re Norstan Apparel Shops, Inc.)*, 367 B.R. 68, 81 (Bankr.E.D.N.Y.2007); *Adelphia Communications Corp. v. Bank of Am., N.A. (In re Adelphia Communications Corp.)*, 365 B.R. 24, 39–41 (Bankr. S.D.N.Y.2007). These relatively recent cases reject the application of the "internal affairs" doctrine to claims against outsiders. The analysis in *Adelphia* is typical of these cases. After noting the split in authority, the court there rejected application of the "internal affairs" doctrine to claims against corporate insiders:

> In this case, the Court sees little reason to conclude that the state of incorporation—Delaware, for most of the Debtors—has such an interest, and thus to conclude that the "internal affairs" doctrine should be applied. There are no compelling reasons to apply the "internal affairs" doctrine here, since the claims do not involve "matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders." Here determination of the aiding and abetting issues does not involve a determination as to the nature or extent of the fiduciary duties that were owed by the [corporate insiders] or other [members of] management, or the extent to which fiduciary duties were breached. There is no risk that different courts might reach different conclusions as to the applicable standards for appropriate officer or director conduct, or as to claims for failure to satisfy these standards. This case instead involves basic principles of tort secondary liability, as established in the current Restatement (which applies to many different types of torts), and which principles are applicable to alleged aiding and abetting of many types of primary violations of duty—of which a breach by a corporate officer or director is only one.

365 B.R. at 41. In this case, any alleged injury to Verilink would have occurred at its principal place of business in Madison, Alabama. The Trustee makes no argument to the contrary, thereby conceding that Count XVI must be dismissed if Alabama law applies, which it does.

382

## CONCLUSION

For all these reasons, this Court grants the present motion and dismisses with prejudice all of Plaintiff's claims against Raymond James under Federal Rule of Civil Procedure 12(b)(6). Because this Order disposes of separable claims and dismisses a party entirely, and because the Court finds no just reason for delay, this Court certifies the judgment as final and immediately appealable pursuant to Federal Rule of Civil Procedure 54(b). Accordingly, the Court directs entry of final judgment on all claims asserted against Raymond James based on the determinations made herein.

**DONE and ORDERED.**